J-A34038-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: J.D.G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: E.L.G., JR., FATHER | No. 1247 MDA 2015 |

Appeal from the Order Entered June 19, 2015
In the Court of Common Pleas of Lancaster County
Orphans' Court at No(s): 2014-2269

BEFORE:  PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:  **FILED DECEMBER 18, 2015**

E.L.G., Jr. ("Father") appeals from the order of the Lancaster County Court of Common Pleas terminating his parental rights to his child J.G.[1]  We affirm.

The trial court set forth the relevant factual history as follows:

> [J.G.] is a minor male child born . . . in Blair County, PA. He currently resides with [R.P. and S.P. ("Petitioners")], three of his biological half-siblings, and one full-sibling.  All four children were adopted by Petitioners on March 4, 2015. Mother voluntarily placed [J.G.] in Petitioners' home on June 12, 2014.

---

[1] J.G.'s biological mother ("Mother") signed a consent to adoption and the trial court terminated her parental rights, pursuant to § 2504 of the Adoption Act.  23 Pa.C.S. § 2504 ("Alternate procedure for relinquishment").  Mother has not appealed.

[Mother] is 31 years old. Mother was present at both hearings. She testified at the April 8, 2015 hearing in support of the confirmation of her Consent to Adoption.

[Father is t]he biological father of [J.G.] . . . . He is 35 years old. Father has been in prison since 2004 and is currently incarcerated at River North Correctional Center in Independence, Virginia. Father anticipates a release date sometime in 2016 or 2017.[1] Father was present via video conferencing and was represented by [c]ourt[-]appointed counsel.

[1] VA Department of Corrections records have 2018 as release date, but Father states he will get out sooner based on good behavior.

Petitioners are a married couple living in Lancaster County, PA. Petitioners have custody of and are the current guardians of [J.G.] in accordance with a [g]uardianship [a]greement.[2]

[2] Mother signed a guardianship agreement for Petitioners as guardians of [J.G.] on June 12, 2014.

Memorandum Opinion and Decree, 6/19/2015, at 2-3.

On November 4, 2014, Petitioners filed a petition to involuntarily terminate Father's rights. The trial court conducted hearings on January 15, 2015 and April 8, 2015. On June 19, 2015, the trial court terminated Father's parental rights. Father filed a timely notice of appeal. Both Father and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Father raises the following issues on appeal:

I. Did the [trial court] err and abuse its discretion in terminating the parental rights of [] Father in that [] Father was incarcerated during a significant period of time during the pendency of the underlying juvenile dependency action, but [] Father nevertheless utilized the resources

available to him in continuing a relationship with his child. [] Father forwarded written correspondence to the child's mother that either inquired about the well[-]being of his child or was intended for his child?

II. Did the [trial court] err and abuse its discretion in terminating the rights of Father, as termination of Father's rights is not in the best interests of the child and will not promote the physical, mental, or emotional well[-]being of the child, as [] Father will in the near future be released from prison and within a reasonable time be capable of performing parental duties and providing permanency for his child?

III. Did the [trial court] err in denying the request of [] Father for a continuance of the termination of parental rights hearing so that Father might present testimony from a witness that can corroborate the efforts made by Father to contact the Child's mother and the Children and Youth Agency?

Appellant's Brief at 16.

Our standard of review for trial court orders involving the termination of parental rights "is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child." *In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super.2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super.2009)). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *Id.* (quoting *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004)). This Court "employ[s] a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *Id.* (quoting *In re B.L.W.*, 843 A.2d at 383). The trial court, as fact-finder, "is the sole determiner of the credibility

of witnesses." *In re Z.P.*, 994 A.2d at 1115 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131–32 (Pa.Super.2007)).

The party seeking to terminate parental rights has the burden to establish by clear and convincing evidence that grounds for termination exist. *In re Z.P.*, 994 A.2d at 1115. "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (quoting *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super.2002)).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), and (b), which provides:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Adoption of R.J.S.*, 901 A.2d 502, 508 n. 3 (Pa.Super.2006).

Father first maintains the trial court erred in finding termination proper under Section 2511(a) because he was incarcerated and allegedly used the resources available to him to perform his parental duties. Appellant's Brief at 21-25.

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition." *In re Z.P.*, 994 A.2d at 1117 (quoting *In re C.S.*, 761 A.2d 1197 (Pa.Super.2000)). Although "incarceration of a parent does not, in itself, provide grounds for the termination of parental rights[,] a parent's responsibilities are not tolled during his incarceration." *In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super.1999). Further, the court should not simply

mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*Id.* (quoting *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super.2004), *appeal denied,* 872 A.2d 1200 (Pa.2005)).

The trial court made the following findings following the hearing:

Father was arrested in June 2004 and [pled] guilty to first-degree murder. He received a sentence of 50 years imprisonment, with all but 15 years suspended. Prior to Father's incarceration, Mother and Father resided together with [J.G.]. [J.G.] was 10 months old at the time of Father's imprisonment - this was the last time Father saw [J.G.]. Father testified that he was an involved father and would take [J.G.] to the park, change him, cook and eat with him, among other things[,] and believes that during those 10 months, he and [J.G.] formed a bond.

Mother and Father kept in contact from the date of Father's incarceration until sometime in 2008, when Mother stopped writing to and answering written correspondence from Father. Father's second child, [J.G.'s] full biological sister, [A.G.], was born two months into Father's sentence. Included in Father[']s letters to Mother were drawings and cards Father had made for [J.G.] and [A.G.]. Mother would respond to the letters with updates on the children and kept him up to date with pictures and the children's drawings. During the hearing, Father was asked if Mother told him these things because he asked about the kids in the letters. Father responded that Mother actually wrote and kept him up to date on everything with the kids without him asking.

Mother moved in 2008 and never sent Father a forwarding address or new phone number. She did testify that a forwarding address was left with the [p]ost [o]ffice. Father testified that he continued to send letters to Mother for seven months. In 2010, Mother made contact with a few of Father's siblings on Facebook and that contact continued. In 2011, Mother reached out to [p]aternal [a]unt, Latisha, so that [J.G.] could play with his cousins. This continued sporadically for that summer. Mother testified that she was always the one initiating that contact and eventually quit putting forth that effort.

- 6 -

Father testified that he would get updates on both [J.G.] and [A.G.] from his brother and sister who had some contact with Mother, but that they would never give him Mother's address. Father admitted that he had never made any request to see [J.G.] since his incarceration. Father never made any requests for visitation in writing and never filed a custody action to request prison visitation in Virginia. Further, Father has never requested pictures, report cards, or updates on [J.G.]. It is Father's position that he could not do any of these things because he did not know how to contact Mother. There is also no indication that members of Father's family, who had contact with Mother, intervened or advocated for him with Mother in any significant or meaningful way. Father also knew the names of Mother's immediate relatives in the Lancaster area, some who had the same addresses for many years and whom he had met. There is no indication in the record that he ever attempted to contact them for assistance. Mother also applied for support from Father and her address appeared in that record.

. . .

In 2012, [A.G.] was taken into the custody of the Lancaster County Children and Youth Social Services Agency (hereinafter "Agency") along with three of her half siblings. Father received notification of this event and all subsequent hearings regarding [A.G.]. He testified that he used the information of those reports to keep updates on his children.[4] Included in each of those reports was an update on Mother's progress and her current address. These reports were sent at the time of each hearing, at least every six months. Father then testified that he has known Mother's address from the time he received the first permanency plan in 2012 until his parental rights to [A.G.] were involuntarily terminated on April 14, 2014. In fact, he was able to repeat from memory Mother's exact address, having read it from the reports, which he has not received for a year. Father received notice of the termination proceeding regarding [A.G.] and did not participate in that proceeding. Father testified that he sent numerous letters to the caseworker, the bail administration office, and mother. The caseworker, [S.P.], and Mother all testified they had not received any letters for [J.G.] from Father.

- 7 -

4. These reports from the Agency were only for [A.G.]; [J.G.] was not in Agency's custody and, therefore, Father never received any updates through permanency review for [J.G.].

Petitioners' attorney also sent Father a letter after Mother voluntarily placed [J.G.] in their care in June 2014, notifying Father that [J.G.] and [A.G.] were together and in Petitioners' care. Father, therefore, had notice that [J.G.] was not with his Mother. Father, however, did not use this avenue to attempt to reestablish contact with his son. Instead, Father's only correspondence was to a lawyer in which he expressed his desire that his family get custody. It should again be noted that there isn't anything in the record to establish that Father's family has made any effort on his or their own behalf to maintain a significant and meaningful place in [J.G.'s] life.[5]

5 The letter states[:] "I have reliable family that works has kids that never been in any trouble, they work. So I'm contacting this lawyer and seeing what could be done about my family getting custody of my son." During Father's testimony, he said he only currently talking [sic] to two members of his family because the rest "haven't been there for me." During the hearing, Father confirmed that his brother Dale had refused to take custody of [J.G.].

Father testified he didn't have Mother's address in order to send correspondence after she moved in 2008. Father stated it was impossible for him to send any correspondence to [J.G.] because of Mother's desire of no contact. However, the record is clear that Father did have knowledge of Mother's address starting in 2012 from the Agency paperwork, which he received in [A.G.'s] dependency case. There were also other avenues which he did not pursue including maternal and paternal relatives, and domestic relations. He failed to do anything with any of this available information.

Under Section 2511(a)(1), the [c]ourt must look to Father's actions in the six months prior to the filing of the petition. Father did not contact Mother, [J.G.], or Petitioners for more than the six months prior to the filing

of and his receipt of the involuntary termination petition. Father failed in all respects to perform any parental duties or responsibilities within that time period, arguably extending back to 2008, and certainly since he learned of Mother's whereabouts in 2012. He maintains that he would be a good Father in a couple years when he is released from prison. Father argues that he would never sign over his rights to his children and that he has less than two years left to serve in jail. In essence, father is asking that [J.G.] not be adopted into a family along with his siblings, because Father wants the opportunity in two years to raise him.[6] Parental rights are not preserved . . . for a more convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. [*See*] *In re C.S.*, 761 A.2d 1197 (Pa.Super. 2000); *In re G.P.R.*, 851 A.2d 967 (Pa. Super. 2004). Even after his parental rights to [A.G.] were terminated and there was a possibility that his parental rights to [J.G.] might also be terminated, Father still failed to take any action.

> [6] "[H]e might even be in a situation, too, where he's actually in a good living condition right now. But – but who are – who are you to say that if I got out and he lived with me that I wouldn't be a good – good father to him?"

"A parent cannot protect his parental rights by merely stating that he does not wish to have his parental rights terminated." *In re C.M.S., supra* at 462. Other than Father's desire to contact [J.G.] on Father's terms and raise him, Father has not given a reason why his parental rights should be protected despite his lack of contact with his son since 2008. Moreover, he did not act affirmatively to foster any kind of parental relationship with [J.G.] since 2008. Father's obligation to maintain his relationship with [J.G.] continued, in spite of his incarceration.

[J.G.] has not had any contact from Father in 7 years. Because of his age[,] that contact was actually between Mother and Father, and [J.G.] was too young to remember it. Father has not seen [J.G.] in 11 years. While Mother did impose barriers to contact after 2008, Father still had an obligation to use reasonable efforts to overcome them. Father did have knowledge that [J.G.] was in Petitioner's

custody since June 2014, and still did nothing. Furthermore, Father was aware of Mother's address in 2012, and did nothing. Father's family did nothing on behalf of Father to assist him. His parental rights to [A.G.] were terminated because of his failure to be a parent so he was aware of what could happen. Mother's desire to have no contact with Father might be a convenient excuse, but the record reflects that contact clearly wasn't as impossible as Father would have the [c]ourt believe. Father's conduct and failure to maintain a place of importance in his son's life over the last 7 years evidences a settled purpose of relinquishing his parental rights and a failure to perform parental duties, under §2511(a)(1) of the Adoption Act.

Memorandum and Decree, 6/19/2015, at 4-8 (some internal footnotes and citations omitted).

In its Rule 1925(a) opinion, the trial court further found:

Father did not use all the resources available to him to continue his relationship with [J.G.] since 2008. Father claims Mother made any contact completely impossible. Unfortunately, Father is still focused on what he perceives Mother did or did not do, when in reality, it was his responsibility to be a parent to his child and foster a relationship with him. Father believes his incarceration prevented him from maintaining a relationship with [J.G.]. Father's incarceration is due to his unlawful activity. The obstacle to maintaining a bond with his child is one of his own making and yet another consequence of his actions. Father has been incarcerated more than ninety percent of [J.G.'s] life. The [c]ourt disagrees that contact was impossible and goes into a thorough analysis in its Opinion. Father had many avenues with which he could have contacted [J.G.] outside of Mother's control. Father did not utilize any of them. He alleges ongoing written correspondence with Mother and to the Lancaster County Children and Youth Agency caseworker inquiring about his child. Both Mother and the caseworker testified that they never received any letters.

Opinion Sur Appeal, 8/6/2015, at 2. The trial court conducted a thorough analysis, which was supported by competent evidence. The trial court did not err, or abuse its discretion, in finding termination of Father's parental rights proper under Section 2511(a)(1).

Father next maintains the trial court erred in finding termination of his parental rights would be in J.G.'s best interests. Appellant's Brief at 26-27.

"Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b)." *In re Z.P.*, 994 A.2d at 1121. "Section 2511(b) 'focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.'" *In re Adoption of C.J.P.*, 114 A.3d 1046 (Pa.Super.2015) (quoting *In re Adoption of J.M.,* 991 A.2d 321, 324 (Pa.Super.2010)). Although "a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *Id.* (quoting *In re N.A.M.,* 33 A.3d 95, 103 (Pa.Super.2011)). The trial court must also consider:

> the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id.* (quoting *In re A.S.,* 11 A.3d 473, 483 (Pa.Super.2010)).

The trial court found the following regarding the best interests of J.G.:

> Petitioners were also the foster parents of [J.G.'s] siblings, all four of whom they have adopted. Petitioners have had three of his siblings in their care since 2012 and [A.G.] since March 2013. Petitioners intend to seek adoption of [J.G.] if the Petition to Terminate Parental Rights is granted. Although [J.G.] has been in Petitioners['] care since June 13, 2014, they were familiar with him since 2012 when his siblings were placed in their care. [S.P.] testified, "When it looked like things were starting to go towards adoption for his other four siblings, [Mother] asked us if we would be willing to take him as well because she wanted to keep all of the siblings together. We had been visiting with him and keeping contact between the siblings prior to that, so we already had kind of a relationship established with him." (N.T. 4/8/15, 9 lines 5 - 11).

> [J.G.], although living with his Mother the majority of his life, has been moved back and forth between houses of maternal relatives. His life was very unstable. Thanks to Mother and her love and sacrifice, [J.G.] finally has a home, one that includes his biological siblings. He has expressed his desire to stay with the Petitioners, to live with his siblings, and to be adopted.

> Father stated that it might not necessarily be in [J.G.'s] best interest to deny him the opportunity to be adopted with his siblings. However, Father still insists that [J.G.] should have to wait for permanence until Father is eventually released from prison. [J.G.] is almost 12 years old. He needs permanence and stability in his life. Father has been incarcerated since [J.G.] was 10 months old. His Mother tried but could not provide an appropriate home for him. However, she recognized her own deficits. She placed [J.G.'s] interests above her own. She insured that he was placed in a loving and stable home, surrounded by his siblings, with parents who will love and care for him.

> Father, to the contrary, does not seem to appreciate the instability this child has experienced or the role he has

played. Father has not had any direct contact with [J.G.] since [J.G.] was 10 months old, [J.G.] does not remember Father, though he has been shown pictures. [J.G.] indicates he does not want contact from Father. When Father was told about what [J.G.] wanted, Father responded by stating that [J.G.] could have been coerced into saying that.

Father does not have and could not have any meaningful or substantial bond with [J.G.]. He remembers [J.G.'s] first 10 months of life, but has forgotten that as a result of his own conduct and through no fault of [J.G.], he has not really been involved in [J.G.'s] life since 2004. As a result of Mother's decisions in 2014, [J.G.'s] life has improved immeasurably. The termination of Father's parental rights will not be harmful to [J.G.]. It will not destroy a necessary or beneficial parental relationship since none exists. However, failure to terminate Father's rights and to deny [J.G.] the permanence and stability which adoption would provide, will be detrimental to his emotional and physical wellbeing.

Based upon the evidence presented and having resolved all issues of credibility, the [c]ourt finds for the above stated reasons, that [] Petitioners have established by clear and convincing evidence that the parental rights of Father should be involuntarily terminated as requested and that the termination will promote and enhance the development, physical and emotional needs and welfare of [J.G.].

Memorandum and Opinion and Decree, 6/19/2015, at 10-11. The trial court did not err or abuse its discretion when it found the termination of Father's parental rights would be in J.G.'s best interest.

Father's final issue challenges the trial court's denial of his continuance request. Appellant's Brief at 28. He claims the denial prevented Father from presenting his brother as a witness, whose testimony would have corroborated Father's testimony. *Id.*

"The trial court is vested with broad discretion in the determination of whether a request for a continuance should be granted, and an appellate court should not disturb such a decision unless an abuse of that discretion is apparent." ***Baysmore v. Brownstein****,* 771 A.2d 54, 57 (Pa.Super.2001) (quoting ***Walasavage v. Marinelli****,* 483 A.2d 509, 518 (Pa.Super.1984)). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias or ill-will." ***Id.***

The trial court found:

> Father had notice of the hearing for three months prior, yet he did not notify the [c]ourt that his witness was unavailable until the day of the hearing when this [c]ourt and the Petitioners were ready to proceed. He did not request that his witness be allowed to testify via telephone. Further, he did not even have a consistent date when his witness might be available to testify.[3] The [c]ourt denied the motion for continuance.
>
> > [3] At the time of the request by Father's attorney, Father was only asking for a week continuance date. Later during Father's testimony, he stated it would be two or more months before his witness could testify.
>
> The record reflects the [c]ourt's reasoning to deny the motion for continuance in order for Father's witness to testify regarding Father's attempts to contact [J.G.]. The [c]ourt made it clear that the [p]etition was filed in late 2014, that the date of this hearing was set in January 2015, and Father had notice of the time and date in advance in order to make arrangements for his witness's testimony.

- 14 -

During his testimony, Father said he had not heard from Dale in over one month because he was deployed. Despite knowing for a month that his witness would be unavailable, Father did not contact the [c]ourt or have his counsel contact the [c]ourt, over that period to request a continuance. Thus, it was Father's choice to appear at the hearing with no witnesses and to proceed based only upon his assumption that this [c]ourt would grant his last[-]minute motion.

The [c]ourt also noted at the time of the hearing its discretion to grant the continuance at the end of the hearing should it feel the testimony would be necessary to the outcome. After hearing the testimony the [c]ourt was unpersuaded that the testimony of Father's potential witness would, even if available, provide information crucial to the [c]ourt's decision. The record is clear that Father's family has not been involved in [J.G.'s] life in any meaningful or beneficial manner.

Finally, the [c]ourt found the testimony of [S.P.], Mother, and Emily Harris, the Agency caseworker, to be compelling, persuasive and credible. Mother was forthright in her testimony and answered all questions directly. The court found her to be truthful. Ms. Harris did not have any stake in this proceeding. Her independent testimony about Father's lack of contact with the Agency during the dependency and termination proceedings involving [A.G.] beginning in 2012, is in stark contrast to Father's recollection. She had the opportunity to review the Agency records and could only find one letter from Father. The Agency did not receive the numerous letters referenced by Father. The [c]ourt also found her testimony to be factual and credible. [S.P.] was equally credible in her testimony concerning [J.G.'s] placement with her family by Mother. She testified to the lack of any contact by Father after learning that [] Petitioners had custody of [J.G.], with the exception of the August 2014 letter Father wrote in response to finding out that [J.G.] had been placed with [] Petitioners, which is attached to [] Petitioner's termination petition as Exhibit "C".

To the contrary, Father's testimony lacked credibility. While the [c]ourt does not doubt that he believes he loves [J.G.] based upon his experiences as a father over [J.G.'s]

- 15 -

first ten months of life, Father's actions after 2008 speak much louder than his words. He failed to accept any responsibility for any of his own conduct, including his own involvement in the murder for which he remains in jail, even though he entered a guilty plea to the charge, admitting his participation.

The discrepancies in the record between his testimony and that of Ms. Harris are glaring. Father's failure to have his sister and/or brother testify in support of everything he claims to have done to stay in contact with [J.G.], knowing that his parental rights could be terminated, is quite telling. His knowledge of the possible termination of his parental rights is evidenced by his letter to Attorney Emily Bell in August, 2014, and his subsequent failure to take any action belies his testimony that he did everything he could to remain in a place of importance in [J.G.'s] life.

Father attempted to paint the picture that Mother is solely responsible for his lack of contact with his son. The record establishes that this is just not true. His testimony of events after 2008 was self-serving and clearly lacked credibility.

Opinion Sur Appeal, 8/6/2015, at 4-6 (internal citations to record omitted).

The trial court did not abuse its discretion when it denied Father's continuance request.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/2015

- 16 -