J-A10045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: K.B., A MINOR,   :   IN THE SUPERIOR COURT OF
   :   PENNSYLVANIA
   :
   :
APPEAL OF: A.J.B.   :   No. 1930 WDA 2015

Appeal from the Order October 29, 2015
In the Court of Common Pleas of Clarion County
Civil Division at No(s): CP-16-DP-0000012-2013,
FID 16-FN-000005-2013

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PANELLA, J.

MEMORANDUM BY GANTMAN, P.J.:        **FILED MAY 20, 2016**

Appellant, A.J.B. ("Mother"), appeals from the order entered in the Juvenile Division of the Clarion County Court of Common Pleas, which changed the permanency goal from reunification to adoption, following the Clarion County Children and Youth Services' ("CYS") petition for a permanency hearing.  We affirm.

In its opinion, the juvenile court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we will only briefly summarize them.  CYS took custody of K.B. ("Child"), a minor, in July 2013, when the police found her living with Mother and Father in deplorable conditions.  Child was adjudicated dependent on July 16, 2013, and was placed with her paternal grandmother until August 7, 2013, when she was no longer able to care for Child.  Child was placed with her paternal aunt and uncle, who cared for Child until February 13, 2014.  Child was then placed

with foster mother, where she has remained since that time.

On March 23, 2015, CYS filed a petition for a permanency hearing, as Mother and Father had continuously failed to meet their goals for reunification with Child. The court conducted permanency hearings in May and October 2015. At the conclusion of the hearing on October 20, 2015, the court determined Mother and Father had not met their permanency plan goals, and likely never would, and that CYS should proceed with termination of parental rights. That same day, the court entered an order, docketed October 29, 2015, which stated Child was to remain in foster care and changed the goal from reunification to adoption. On November 25, 2015, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother raises the following issues for our review:

> DID THE [JUVENILE] COURT ABUSE ITS DISCRETION AND ERR AS A MATTER OF LAW IN FAILING TO CONSIDER MATERNAL GRANDMOTHER AND MATERNAL STEP-GRANDFATHER'S DESIRE TO ADOPT THE MINOR CHILD OR IN THE ALTERNATIVE THEIR DESIRE FOR PERMANENT GUARDIANSHIP OF THE MINOR CHILD?
>
> DID THE [JUVENILE] COURT FAIL TO FIND THAT [CYS] DID NOT PROPERLY CONSIDER KINSHIP PLACEMENT OF THE MINOR CHILD WITH THE MATERNAL GRANDMOTHER AND STEP-GRANDFATHER IN CONFORMITY WITH 62 P.S. § 1303?
>
> DID THE [JUVENILE] COURT FAIL TO FIND THAT [CYS] DID NOT PROPERLY FOLLOW PROCEDURES IN DOCUMENTING WHY KINSHIP PLACEMENT WAS NOT POSSIBLE IN CONFORMITY WITH PA.R.J.C.P. NO. 1149 AND 62 P.S. § 1301, 1302, AND 1303?

DID THE [JUVENILE] COURT FAIL TO HOLD A HEARING TO MAKE A FINDING THAT FAMILY FINDING MAY BE DISCONTINUED?

(Mother's Brief at 4).

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.*, 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822–23 (internal citations omitted).

The Juvenile Act controls the disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

> **§ 6351. Disposition of dependent child**
>
> *   *   *
>
> **(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:
>
> (1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\* \* \*

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

\* \* \*

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where

the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)    If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)    If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)    If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5)    If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

**(f.2) Evidence**.—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order**.—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g).

"When the child welfare agency has made reasonable efforts to return a [dependent] child to…her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C., supra* at 823 (citing *In re G.P.-R.*, 851 A.2d 967, 973 (Pa.Super. 2004)).

Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under Section 6351. *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); *In re S.B.*, 943 A.2d 973, 978 (Pa.Super. 2008), *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008). "[T]he parent's rights are secondary" in a goal change proceeding. *In re D.P., supra*.

Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C., supra* at 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002). *See also In re S.B., supra* at 981 (giving priority to child's safety and stability, despite parent's substantial

compliance with permanency plan); *In re A.P.*, 728 A.2d 375, 379 (Pa.Super. 1999), *appeal denied*, 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

*In re R.M.G.*, 997 A.2d 339, 345 (Pa.Super. 2010).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable James G. Arner, we conclude Mother's issues merit no relief. The juvenile court's opinion comprehensively discusses and properly disposes of the questions presented. (*See* Juvenile Court Opinion, filed December 21, 2015, at 13-16) (finding: **(1)** "family finding" law does not require court to consider, inquire about, or promote grandparent's desire to adopt or obtain guardianship; **(2)** family finding law did not require CYS to consider all relatives or to give consideration to only certain relatives, such as maternal grandparents; CYS complied with family finding statutes and gave first consideration to relatives when CYS placed Child with paternal grandmother, whom Mother and Father identified as their preferred placement; CYS initially considered placing Child with maternal grandparents in July 2013, but Mother and Father identified paternal grandmother as their preferred placement; Mother and Father instructed CYS not to tell maternal grandparents about circumstances;

Mother and Father did not indicate desire to have maternal grandparents informed of situation until Child was placed with foster mother in February 2014; CYS perceived that Mother and Father did not want Child placed with maternal grandparents, as Mother and Father did not communicate with maternal grandparents and had poor relationship with them; CYS decided to place Child with relative who would work with Mother and Father to meet initial goal of reunification; CYS determined it was illogical to place Child with relative with whom Mother and Father did not communicate or share any information; **(3)** CYS documented kinship placements when Child was placed with paternal grandmother and then paternal aunt and uncle during Child's first seven months of CYS' involvement; law does not require CYS to document that attempts were made to place Child with every relative of Mother and Father, nor does law require CYS to evaluate all relatives and rank them according to best placement; CYS' goal was to find stability for Child while attempting to reunify her with Mother and Father; once Child was placed with appropriate relative, it would have been contradictory to CYS' goal to continue seeking placement with other relatives solely to satisfy these relatives' desires; CYS met objections of family finding statute by communicating with maternal grandparents through kinship letters and multiple telephone conversations, and by arranging and promoting visitations with Child; **(4)** at permanency hearing, court addressed CYS' discontinuation of family finding by not seeking placement with another

relative; evidence indicates Child is in pre-adoptive placement, and CYS is proposing that foster mother, who has had custody of Child since February 13, 2014, should adopt Child; Child's current placement with foster mother should continue, and CYS should file petitions for involuntary termination of Mother and Father's parental rights; CYS is continuing to allow contact between maternal grandparents and Child; CYS has complied with family finding requirements, and court met statutory requirements for hearing and specific finding).  The record supports the court's decision; therefore, we have no reason to disturb it.  Accordingly, we affirm on the basis of the court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/20/2016

**IN THE COURT OF COMMON PLEAS
OF CLARION COUNTY, PENNSYLVANIA**

IN RE:  K. B.                                          :

a minor child.                    :    NO. 12 DP 2013

                                                           :

**OPINION PURSUANT TO PA.R.A.P. 1925(a)(2)**

Arner, J.                                                                December 18, 2015

### I.   Background

This case started in the summer of 2013 when the police took protective custody

of a two year old little girl,   K. B.      , because her mother and father,  A. B.   and

 J. B.   , were found sleeping during the middle of the day and K. B. was

unattended in the house, which was in deplorable condition with dog feces, food, dirty

diapers all over the floor, and there was a lack of food for K. B. For over two years,

Clarion County Children and Youth Services (CYS) and various service providers

worked diligently with the parents to meet a goal of reunifying K. B. with them, but the

parents failed to make any progress.  During that time, the parents split up, moved

around from place to place and never obtained adequate housing.  Also, mother was

incarcerated at times and eventually she refused to communicate with CYS.

At the last permanency review hearing held in May and October, CYS sought a

goal change from reunification to adoption. K. B. had been in foster care for over 15 of

the last 22 months.  I did change the goal to adoption and directed CYS to file petitions

for involuntary termination of both parent's rights.

K. B.'s mother,   A. B.,   has now appealed my Permanency Review



Order of October 20, 2015. She is not contesting my finding that her rights should be terminated. Instead, she is challenging my finding that CYS complied with the Family Finding requirements of the law regarding her mother, S. A. , A. B. is appealing my finding on behalf of her mother, S. A., who is seeking to obtain custody of K. B.

## II.    Issues

A. B.    states in her Concise Statement of Errors Complained of on Appeal that:

1. The court abused its discretion in failing to consider maternal grandmother's and step-grandfather's desire to adopt or obtain permanent guardianship of the child.

2. The court failed to find that Children and Youth Services (CYS) did not properly consider kinship placement with maternal grandmother and step-grandfather in conformity with 62 P.S. Section 1303.

3. The court failed to find that CYS did not follow the procedure in documenting why kinship placement was not possible in conformity with Pa.R.J.C.P. 1149 and 62 P.S. Sections 1301, 1302 and 1303.

4. The court failed to hold a hearing to make a finding that Family Finding may be discontinued.

## III.    Facts

The transcript of the permanency hearing held on October 19, 2015 will show that Brad King, a CYS Ongoing Caseworker, testified that when K. B. was first taken

2

into protective custody on July 2, 2013 the agency placed her with her paternal grandmother, R. Y. K. B. remained in that kinship placement until August 7, 2013. R. Y. had informed CYS that it was too much for her. Also, there was a problem with head lice, which was labor intensive. R. Y. requested a change. The agency then placed K. B. on August 7, 2013 with her paternal uncle and aunt, R. B. and M. B, and that placement continued until February 13, 2014. R. B. and M. B. had trouble meeting the foster care licensing requirements and there was an ongoing lice issue. They decided they could not continue to keep K. B. On February 13, 2014, the agency placed K. B. in foster care with R. R. who has maintained custody continuously since that time.

Brad King also testified that K. B. is very attached to R. R. He agrees with the opinion of Dr. VonKorff, presented on May 21, 2015, that K. B. has a primary emotional attachment with R. R. Mr. King has observed that attachment as well.

On cross examination by A. B. attorney, Brad King testified that during the period when K. B. was in the kinship placements with R. Y. and R. B. and M. B. from July 2, 2013 until February 13, 2014, he does not remember maternal grandmother and step-grandfather, S. A. and Sa. A. wanting K. B. placed with them. They were more concerned about visits and they wanted to see her more. On July 26, 2013, the A. 's came to the agency asking about the kinship placement. After that time, agency representatives met with the A. 's a number of times at the CYS office. They were concerned about expanded

3

visits, possibly overnights. Brad King was never under the impression that S. A. wanted custody of K. B. He does not recall them asking to change the placements.

As noted, Brad King referred during his testimony to the opinion of Dr. VonKorff. CYS initially retained VonKorff to perform bonding assessments of the foster mother, R. R., and maternal grandmother and step-grandfather, S.A. and Sa. A. Dr. Peter VonKorff is a clinical psychologist. He testified at the first day of the permanency hearing on May 21, 2015 that upon considering the results of the bonding assessments, he concluded that K.B. best interest will be served by staying where she is, with R. R. K.B. has a primary attachment with R. R. which is the best predictor of good mental health. If that primary bond is disrupted, K.B. will face a whole gamut of psychological problems. Dr. VonKorff testified that S. A. has a number of strengths, but she also has unresolved feelings of loss and insecurity, tending to be overly close and over-involved with children. S. A. ' way of relating was to err on the side of directing a child's emotional state in a hovering manner.

The hearing was continued from May 21, 2015 to October in part so Dr. VonKorff could perform bonding assessments for the biological parents. He testified again on October 19, 2015 that of the five people he assessed, R. R. has the best opportunity to provide for K. B.'s needs. There is a primary bond and a high level of mutuality. If K. B. would be removed from R. R.'s care, it would be harmful to K.B.'s development. He stated again that the grandmother exhibits insecurity issues.

4

The next witness at the permanency hearing on October 19, 2015 was Rebecca Maguire, the CYS Foster Care Coordinator. She testified that when K.B. was taken into protective custody, the parents A.B. and J.B. were asked for their preferences for a kinship placement. They wanted K.B. placed with the paternal grandmother, R.Y. They did not want K.B. placed with the maternal grandmother, S.A. They did not have good feelings toward her. There was not a lot of interaction between the parents and S.A. and there was antagonism between J.B. and S.A. Both A.B. and J.B. were in agreement that K.B. should be placed with R.Y.

When R.Y. was no longer able to take care of K.B. she suggested that custody be transferred to J.B. brother, R.B. K.B. was two and one half years old at the time. Both parents were in agreement with the move to R.B. and his wife. There was no discussion of K.B. going anywhere else.

K.B. had been placed in the kinship care of paternal grandmother and paternal uncle and aunt for a total of seven months, but there was a continual lice problem that was not being taken care of and other issues caused R.B. and his wife to ask that K.B. be removed from their care. The biological parents knew this. They did not give CYS any other names.

At the beginning of February 2014, K.B. was placed in foster care with a non-relative, R.R. CYS selected someone with the time and energy to care for K.B. R.R. is a licensed foster parent. She is a single parent with high energy and has had a lot of training with children.

5

When K.B. was placed with R.R. the goal was still reunification with the biological parents. It was CYS's opinion that placement with a relative with whom the parents did not get along was not conducive to reunification.

Rebecca Maguire testified further that the placement with R.R. is going very well. It meets K.B.'s needs. R.R. has no other children in her home, because K.B. has had "sexually reactive behaviors." She was masturbating, inserting objects, making statements beyond the knowledge of a three year old and displaying behavior of being sexually abused. R.R. has dealt effectively with these issues. Her home is very structured and she has been taking K.B. to counseling. R.R. has a wonderful connected relationship with K.B. She has involved her in activities like gymnastics and cheerleading.

Ms. Maguire stated that the CYS permanency team met with the biological parents for a permanency plan progress review on February 10 and 18, 2015. They talked about the child staying with R.R. and the parents said they wanted K.B. in to stay with her. The CYS Contact Summaries, CYS Exhibits 9 and 10, confirm the parents' agreement.

On cross examination by A.B.'s attorney, Rebecca Maguire testified that placement with R.R. on February 13, 2014 was a group decision, involving her supervisor, the CYS director, the caseworker and casework supervisor. Since K.B. had already been in two placements, they were looking for stability. Also, CYS did not consider placing K.B. with maternal grandmother, S.A. because the parents did not want her placed there. CYS's hands were not tied by the

parents' preference, but since CYS was still working toward reunification, it was not reasonable to place K·B· with someone with whom the parents could not cooperate.

Martin Richards, a licensed social worker who performed a trauma assessment of K·B· for CYS, testified that K·B·'s overall rating was very high and unique. There is a suspicion of sexual abuse. Apparently, a friend of the parents who was a known sex offender had been in the home. K·B·'s behavior involved hitting and very low empathy and the assessment shows a very high aggression score. Mr. Richards gave an opinion that this is the result of a traumatic event which K·B· will take into adulthood. K·B· is high maintenance because of the trauma. She is bonded with R·R· and R·R· is capable of providing a proper environment to care for her special needs. Mr. Richards expects to see improvement in K·B·

Laine Bookwalter, Program Clinician at Project Point of Light, is providing trauma based counseling for K·B· She described K·B· sexualized behaviors and her aggressive behaviors, including fighting, biting and pushing, in school. She stated that K·B· responds well to R·R· K·B· does not want to leave her home. Ms. Bookwalter has increased the frequency of the sessions from once per month to once per week.

As part of mother's case in chief, she called CYS Ongoing Caseworker Nicole Novicki. Ms. Novicki stated the first contact with S·A· was in July 2013, when she came into the agency wanting information about the case. Ms. Novicki could not give her information because the biological parents did not want S·A· to know what had happened. CYS knew before that time that A·B· had parents, but

7

did not know the details.

CYS sent a kinship letter to S.A. on July 25, 2013. S.A. then called CYS and the caseworker explained that K.B. was in a kinship placement and there was no reason to move her. CYS made a record of the conversation. S.A. wanted visits. CYS attempted visits, but they had difficulty because there were three other siblings in care and two other fathers for whom CYS also had to coordinate visits and some of those parties were not getting along. CYS did place S.A. on the "Fostering Connections" form. CYS did communicate with S.A. and document the contacts through the kinship letter to S.A. of July 25, 2013 (Mother's Exhibit A) and through the Fostering Connections form (Mother's Exhibit B).

Ms. Novicki testified further that when CYS moved K.B. from R.B. to R.R., she did not contact S.A. about placement. CYS learned from the biological parents at a meeting in the Fall of 2013 that they were feuding with S.A. and they did not want the A.'s to have knowledge of any details of the case.

Later, in the Spring of 2014, CYS did perform a home study for S.A. and Sa.A. for purposes of concurrent planning. CYS did not place K.B. with the A.'s because it was not in her best interest. There were a number of concerns and father, J.B. thought he would not have any contact with if she was in the care of S.A.

Mother's next witness at the permanency hearing on October 20, 2015 was maternal grandmother, S.A. She stated she did contact CYS on July 26,

2013 and said she was interested in placement. When she received the kinship letter, she called CYS on July 31, 2013 and expressed concerns about the placement. She contacted CYS again on August 7, 2013 when she learned K.B. had been moved to R.B.'s custody and again on August 14 when she expressed concerns about the placement. She contacted CYS again when she learned K.B. had been moved to foster care.

S.A. testified that K.B. and the biological parents came to her house for Thanksgiving and Christmas in 2013 and there were no problems. S.A. called CYS in January 2014 to talk about problems in R.B.'s home. On February 13, 2014, when K.B. was placed in foster care with R.R. there was no animosity between S.A. and the biological parents. However, on February 23, 2014, S.A. and J.B. had a falling out and she asked him to move out of a house she owned where he had been staying.

S.A. contacted CYS again in March 2014 and was informed CYS would reintroduce visits at the agency office. S.A. and Sa.A. did have visits with K.B. during the Summer and Fall of 2014, but in December overnight visits were suspended because there was an implication that K.B. had previously been sexually abused. Protocol prevented outside unsupervised visits during the investigation. CYS informed the A.'s they were still working on the goal of reunifying K.B. with her parents. On February 19, 2015, S.A. filed a private custody action in Clarion County and that action is pending.

Mother, A.B., was the final witness. She stated that on the day K.B.

9

was taken into protective custody she did not discuss with CYS that she did not want K·B· placed with her mother. They did discuss it several weeks later. When K·B· was moved to R·B·'s custody, she called CYS and asked why and said if she would need to be moved again, it should be to her parents. CYS said there was no plan to move her again. She is not opposed to placement with the A·'s ·

## IV.    Law and Discussion

### A. Family Finding Rules and Statute

Pa.R.J.C.P. 1608 D(1)(h) requires the court to make a finding at a permanency hearing "whether the county agency has satisfied the requirements of Rule 1149 regarding family finding..." Pa.R.J.C.P. 1609 D(1) provides that "[T]he court order shall indicate whether family finding efforts made by the county agency were reasonable;..." The *Comment* to that Rule advises the court, when making that determination, "... to consider the extent to which the county agency has fulfilled its obligations pursuant to Rule 1149..." Pa.R.J.C.P.1149 A(1) and (2) requires the court to "... inquire as to the efforts made by the county agency to comply with the family finding requirements pursuant to 62 P.S. Section 1301, *et seq.*" and to "place its determination on the record whether the county agency has reasonably engaged in family finding." The *Comment* to that Rule provides in part that,

> Pursuant to paragraph (A), efforts by the county agency may include, but are not limited to whether the county agency is or will be: a) searching for and locating adult relatives and kin; b) identifying and building positive connections between the child and the child's relatives and kin; c) when appropriate: i) supporting the engagement of relatives and kin in social service planning and delivery of services; and ii) creating a network of extended family support to assist in

10

remedying the concerns that led to the child becoming involved with the county agency; d) when possible, maintaining family connections; and e) when in the best interests of the child and when possible, keeping siblings together in care...

Specific evidence should be provided indicating the steps taken to locate and engage relatives and kin. *See Comment* to Rule 1120 regarding diligent efforts considerations for locating relatives and kin. When considering the method by which relatives and kin are engaged in service planning and delivery, courts and the parties are encouraged to be creative. Strategies of engagement could include, but are not limited to, inviting relatives and kin to: 1) be involved in a family group decision making conference, family team conferencing, or other family meetings aimed at developing or supporting the family service plan; 2) assist with visitation; 3) assist with transportation; 4) provide respite or child care services; or 5) provide actual kinship care.

Pursuant to paragraph (A)(2), the court is to place its determinations on the record as to whether the county has reasonably engaged in family finding. The level of reasonableness is to be determined by the length of the case and time the county agency has had to begin or continue the process. For example, at the shelter care hearing, the county agency should at least ask the question whether there is family or kin available as a resource. The initial removal of the child is the most critical time in the case. Potential trauma should be considered and ameliorated by family finding efforts as much as possible...

Rule 1149 B provides,

Family finding may be discontinued only if, after a hearing, the court has made a specific determination that:
(1) continued family finding no longer serves the best interests of the child;
(2) continued family finding is a threat to the child's safety; or
(3) the child is in a preadoptive placement and the court proceedings to adopt the child have been commenced pursuant to 23 Pa.C.S. Part III (relating to adoption).

The statute at 62 P.S. Section 1302.1 provides that "[F]amily finding shall be conducted when the child is accepted for services and at least annually thereafter..." The term "family finding" is defined in Section 1302 as,

Ongoing diligent efforts between a county agency, or its contracted providers, and relatives and kin to:

(1) Search for and identify adult relatives and kin and engage them in children and youth social service planning and delivery.

(2) Gain commitment from relatives and kin to support a child or parent receiving children and youth social services.

Also, Section 1303(b) provides in part,

If a child has been removed from the child's home under a voluntary placement agreement or is in the legal custody of the county agency, the county agency shall give first consideration to placement with relatives or kin. The county agency shall document that an attempt was made to place the child with a relative or kin. If the child is not placed with a relative or kin, the agency shall document the reason why such placement was not possible.

Section 1302.2 provides in part,

A county agency may discontinue family finding for a child under the following circumstances:

(1) The child has been adjudicated dependent pursuant to 42 Pa.C.S. Ch. 63 (relating to juvenile matters), and a court has made a specific determination that continued family finding no longer serves the best interests of the child...

### B. Errors Complained Of

#### 1. First Alleged Error

Mother, A. B., first alleges that the court abused its discretion in failing

12

to consider maternal grandmother's and step-grandfather's desire to adopt or obtain permanent guardianship of the child.

The rules and statute dealing with family finding do not require a court to consider a grandparent's desire to adopt or to obtain guardianship. The court's responsibility, as prescribed by Pa.R.J.C.P. 1608 D(1)(h), is to find "whether the county agency has satisfied the requirements of Rule 1149 regarding family finding..." Rule 1149 makes reference to the statute at 62 P.S. Section 1301, *et seq*. The term "family finding" is defined in Section 1302 as,

> Ongoing diligent efforts between a county agency, or its contracted providers, and relatives and kin to:
> (1) Search for and identify adult relatives and kin and engage them in children and youth social service planning and delivery.
> (2) Gain commitment from relatives and kin to support a child or parent receiving children and youth social services.

Nothing in the statute requires the agency or a court to inquire about or promote adoption or guardianship by a grandparent. In any case, S. A. and Sa. A. are not precluded from seeking to adopt K. B.

## 2. Second Alleged Error

A. B. next alleges the court failed to find that Children and Youth Services (CYS) did not properly consider kinship placement with maternal grandmother and step-grandfather in conformity with 62 P.S. Section 1303.

Section 1303(b) provides that "...the county agency shall give first consideration to placement with relatives or kin." The statute does not require CYS to give

13

consideration to all relatives or to give first consideration only to certain relatives, such as maternal grandparents. Here, Clarion County CYS did give first consideration to relatives and kin and thus, complied with the statute. They placed *K·B·* with her paternal grandmother, who was identified by the parents as the preferred placement.

The testimony at the permanency hearing shows that CYS did not initially consider placing *k·B·* with the maternal grandmother and step grandfather, *S·A· and { Sa. A· }*, in July 2013 because the biological mother and father, *A·B· and J·B·* had identified *J·B·'s* mother, *R·y·* as their preferred placement. The parents did mention *S·A·*. In fact, *the B·'s* had instructed CYS to not tell *S·A· and Sa. A·* anything about what had happened. That attitude persisted until well after *K·B·* had been placed with *R·R·* in February 2014. CYS workers perceived throughout the case that *the B·'s* and

were not communicating and had a poor relationship and that *the B·'s* did not want *K·B·* placed with *the A·'s*. Since the agency's goal until recently was to reunify *k·B·* with her parents, they decided on a placement with a relative who would work cooperatively with the parents to meet that goal. It was illogical to place the child with a relative with whom the parents were not communicating and did not want to share any information.

### 3. Third Alleged Error

Next, mother alleges that the court failed to find that CYS did not follow the procedure in documenting why kinship placement was not possible in conformity with Pa.R.J.C.P. 1149 and 62 P.S. Sections 1301, 1302 and 1303.

14

Section 1303(b) requires an agency to "... document that an attempt was made to place the child with a relative or kin." Here, CYS placed K.B. with her paternal grandmother and then with her paternal uncle during the first seven months of CYS's involvement. CYS certainly documented those two kinship placements.

The statute does not require CYS to document that attempts were made to place the child with every relative or kin. The law does not require CYS to evaluate all relatives and prioritize or rank them according to which would be the best placement. This is not like a custody case where an evaluation must be undertaken to determine who among competing parties is best suited to care for the child. The law on family finding likewise does not entitle a grandparent to engage in a proceeding to modify a kinship placement. Once a child is placed with an appropriate relative it is not necessary for an agency to continue to seek placements with other relatives. Here, CYS's goal was stability for K.B. while efforts were still being made to reunify her with her parents. Changing the placement from one relative to another, solely to satisfy the desire of certain relatives, would have been contrary to that goal.

Nevertheless, CYS did communicate many times with S.A. and did document the contacts through the kinship letter to S.A. of July 25, 2013 (Mother's Exhibit A) and through the Fostering Connections form (Mother's Exhibit B).

S.A. had many telephone conversations with agency representatives. CYS did involve S.A. and Sa.A. throughout this case by arranging and promoting many visitations with K.B. In doing so, it met the objectives of the family finding statute.

15

### 4. Fourth Alleged Error

Finally,  A.B.  alleges that the court failed to hold a hearing to make a finding that Family Finding may be discontinued.

Pa.R.J.C.P. 1149 B provides that,

Family finding may be discontinued only if, after a hearing, the court has made a specific determination that:
(1) continued family finding no longer serves the best interests of the child;
(2) continued family finding is a threat to the child's safety; or
(3) the child is in a preadoptive placement and the court proceedings to adopt the child have been commenced pursuant to 23 Pa.C.S. Part III (relating to adoption).

In the present case, discontinuance of family finding, in terms of not having to seek another relative placement, was at issue in the permanency hearing where CYS was seeking to change the goal from reunification to adoption. K.B. is in a pre-adoptive placement. The evidence clearly shows that CYS is proposing that R.R., who has had custody of K.B. continuously since February 13, 2014, should adopt K.B. I did make a finding on the record at the conclusion of that hearing that the agency had complied with the family finding requirements. I changed the goal to adoption and I directed the current placement with R.R. should continue and CYS should file petitions to involuntarily terminate the parents' rights. This meets the statutory requirements for a hearing and a specific finding under Pa.R.J.C.P. 1149 B. Nevertheless, CYS is allowing continuing contact between the A.'s and K.B. S.A and Sa. A. are not precluded from seeking to adopt K.B.

16

## C. Conclusion

A . B . 's    allegations of error are unfounded and should be dismissed.

BY THE COURT:

_James G. Arner, P.J._    **P.J.**

**James G. Arner, P.J.**

12/22/15
CYS
J Drayer, Esq
T. Heeter, Esq
L. Lerch, Esq
J. Ryan, Esq

17