851 A.2d 967 (2004)
In re: G.P.-R. a/k/a Baby Boy R.
Appeal of: G.P.-R. Natural Father, Appellant.
In the Interest of G.R.
Appeal of: G.P.-R. A Natural Father,
Superior Court of Pennsylvania.
Submitted February 23, 2004.
Filed June 3, 2004.
*970 Gunnar L. Armstrong, Lancaster, for appellant.
Jeffrey Gonick, Leola, Guardian Ad Litem, for appellee.
Lisa J. McCoy, Lancaster, for A.R., appellee.
Anne L. Cooper, Lancaster, for Lancaster County, appellee.
Before: JOYCE, BENDER and KELLY, JJ. *968
*969 BENDER, J.
¶ 1 G.P.-R. (Father), the natural father of G.R., appeals from two orders both dated June 30, 2003, that changed the placement goal from reunification to adoption, and granted the petition to terminate Father's parental rights to G.R. filed by the Lancaster County Children and Youth Social Service Agency (Agency).[1] We affirm both orders.[2]
¶ 2 On April 8, 2002, following a permanency hearing, the placement goal for the child was changed from "return-to-home" to "adoption" pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6301-6365, based in part upon a finding of aggravated circumstances. See 42 Pa.C.S. § 6302. Father filed exceptions that were not served on the Agency. Subsequently, on July 3, 2002, the Agency filed the termination petition, alleging that the parental rights of both Mother and Father should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8). Counsel was appointed for Father, and the court consolidated the goal change and the termination proceedings for joint disposition.[3] Hearings on both matters were held on January 29 and 30, 2003, and based on the testimony and other evidence received, the court set forth the following recitation of the facts:
The child was born on April 11, 2001 at the Women's and Babies' Hospital. Mother is a heroin addict who was taking methadone during the last two months of the pregnancy and she had received no prenatal care. She had used an assumed name in order to receive methadone treatment from a clinic in Coatesville, Pennsylvania. She used the assumed name because there was an outstanding warrant for her arrest on a charge of violating her parole. The Agency took physical custody of the child on April 12, 2001. The child remained in the hospital for several days since he needed to be observed for heroin and methadone withdrawal.
At the time of the child's birth, [F]ather was incarcerated in the Lancaster County Prison. Ultimately, he received a State Prison sentence of 1-1/2 to 3 years on a burglary conviction. This *971 sentence was imposed on June 15, 2001. On November 28, 2002, [F]ather was released from the State Correctional Institution at Frackville, Pennsylvania to a half-way house, Community Correction Program at Conewago, Wernersville, Pennsylvania. He was released on parole from the half-way house on approximately January 20, 2003.
On April 12, 2001, [F]ather was advised of his various rights by Lorraine D. Drost who was a caseworker with the Agency. At that time, [F]ather indicated that no members of his family were in a position where they could care for the child.
Subsequent to the Agency taking custody of the child, an adjudication was scheduled for July 24, 2001. Father was unable to attend since the Agency did not have sufficient time to arrange for his transport from the classification unit at the State Correctional Institution at Camp Hill. At that time, Attorney Daniel Shertzer was appointed counsel for [F]ather. Attorney Shertzer advised the Agency that he would make arrangements for [F]ather to attend the continued hearing if [F]ather contacted him. On August 1, 2001, the Agency sent a letter to [F]ather requesting that he contact Mr. Shertzer. It advised him that the adjudication/disposition hearing was scheduled for October 9, 2001. A follow-up letter was sent by the Agency to [F]ather on August 17, 2001. This letter again advised [F]ather to contact Attorney Shertzer if he wished representation. Father did not attend the adjudication hearing and at that time, Attorney Shertzer's appearance was withdrawn.
A placement plan amendment was approved on October 9, 2001. This plan set forth various conditions for the return home of the child.
Doris Risser is an adoption caseworker and had a telephone conference with [Father] prior to the initial date for the adjudication hearing. While incarcerated at Frackville, [F]ather sent one letter to Ms. Risser and he never called her. After his release from prison, he called Ms. Risser requesting pictures of the child and assistance in obtaining parenting classes. Father first wrote a letter to the child on or about June 25, 2002. There were later letters from [F]ather which were received by the Agency on October 19, 2002, November 10, 2002 and December 9, 2002. The only gifts that [F]ather sent to the child were a handkerchief enclosed with the letter of December 19, 2002 and a photograph of himself.
For a period in excess of one year, [F]ather displayed a complete lack of interest in the child. He failed to inquire of the Agency concerning the child's well being and there were no attempts at contact with his son. Significantly, [F]ather never indicated that he was having difficulty in contacting the Agency.
Father's testimony concerning his excuses for failing to write and attempt contact were incredible and unworthy of belief. I was impressed that [F]ather is a recidivist who testified concerning his attempts to manipulate the prison and parole systems. He testified that he did not have a drug problem and that he participated in programs such as the Twelve Steps solely in an attempt to reduce his sentence. Like his behavior in prison, I found his testimony to be a very superficial effort to manipulate the Court so that he could maintain his parental rights without demonstrating any commitment or responsibility.

* * *
*972 G.P.R. has been in placement virtually his entire life. He resides in a foster home with his half-brother who has already been adopted by his foster parents. He recognizes his foster parents as his true parents. He has never had any contact with his biological father. Accordingly, the child has never developed any bond with his biological father. To terminate the parent-child relationship between G.P.-R. and his biological father will not have any adverse affect on the child. He has done extraordinarily well developmentally. His only "problem" has been a rather common one with inner ear infections which has been remedied through the use of tubes. He is extremely bonded to his foster parents. To disrupt a developing and happy child from the stable loving family unit would be the height of injustice. For all these reasons, the termination of parental rights is in the best interest of the child.
Trial Court Opinion (T.C.O.), 10/28/2003, at 4-7, 10 (citations to the record omitted). Accordingly, with reliance on the above, the court confirmed the goal change to adoption and ordered the involuntary termination of Father's parental rights pursuant to four subsections of Section 2511(a) of the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8).[4] This appeal followed.
¶ 3 On appeal, Father raises four issues for our review:
1. Whether a finding of aggravated circumstances against Father was appropriate when the record established that he had exercised much effort in attempting to re-obtain custody of his child?
2. Whether the goal for the child should be changed to adoption when the record established that the Father had made much effort in attempting to re-obtain custody of his child?
3. Whether the Petition for Termination of Parental Rights should have been dismissed because it was in violation of the Fourteenth Amendment to the United States Constitution for the Agency and the Guardian Ad Litem to file a petition for termination of parental rights before Father had had adequate time to attempt reunification with his son and while the goal of the placement plan amendment remained reunification and, to the extent that 23 Pa.C.S. § 2512 [Petition for involuntary termination] allows such a filing, is it unconstitutional?
4. Whether the petition for termination of parental rights should have been dismissed because the evidence established that Father had made substantial efforts to obtain reunification, beginning before the filing of the petition, and that he was both able and willing to remedy the situation upon his release from incarceration?
Father's brief at 10.
¶ 4 When considering appeals such as the one presently before us, we are guided by the following:
When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental *973 rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict.
In re: Involuntary Termination of C.W.S.M. and K.A.L.M., 839 A.2d 410, 414 (Pa.Super.2003). We are also aware that:
In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.
In re A.L.D., 797 A.2d 326, 336 (Pa.Super. 2002) (quoting In re Adoption of Atencio, 539 Pa. 161, 650 A.2d 1064, 1066 (1994)). Moreover, an abuse of discretion occurs "when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." Id.
¶ 5 Additionally, with regard to an appeal concerning a change in the placement goal of a dependent child, we are mindful that:
When reviewing an order that changes the placement goal of a dependent child from reunification to termination of parental rights and adoption pursuant to the Juvenile Act, our standard of review is abuse of discretion. In C.J.R., this Court further stated:
When reviewing such a decision we are bound by the facts as found by the trial court unless they are not supported in the record. (citation omitted). Furthermore, in a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interests and not those of his or her parents.
In the Interest of J.H., 788 A.2d 1006, 1008 (Pa.Super.2001) (citations omitted) (quoting In the Interest of C.J.R., 782 A.2d 568, 569-70 (Pa.Super.2001)).
¶ 6 Father's first two issues concern the court's order confirming the placement from reunification to adoption. Specifically, Father asserts that the court improperly found that "aggravated circumstances exist[ed] as to [F]ather pursuant to 42 Pa.C.S. § 6302 for failure to maintain any substantial and meaningful contact with his child." Trial Court Order, 6/30/03, at ¶ 5. Father relies on an extensive recitation of the facts, emphasizing his efforts in prison to take courses and get into programs that he asserted would lessen his sentence. He also argues that he did not know he could hand-write letters, but that he started to write to his son after a caseworker told him he should write. Father also contends that he "could not reestablish his relationship with his son while he was still in prison, and the only way to get out was to obtain his parole." Father's brief at 18. Essentially, Father argues that the court mischaracterized his testimony and discounted his reasons for taking classes and programs offered in prison. Father also argues that the court improperly changed the placement goal, because the record demonstrates that it was in the child's best interests for the goal to remain "return home."
¶ 7 Aggravated circumstances encompass a situation where a child is in the custody of the county agency and "the identity or whereabouts of the parents is known and the parents have failed to maintain substantial and continuing contact with the child for a period of six months." See 42 Pa.C.S. § 6302 "Aggravated *974 circumstances" (1)(ii). Moreover, "because the trial judge is in the best position to observe the witnesses and evaluate their credibility, we accord great weight to [his] credibility determinations." In re R.T., 778 A.2d 670, 677 (Pa.Super.2001), appeal denied, 568 Pa. 618, 792 A.2d 1254 (2001).
¶ 8 The trial court's rendition of the facts, which we find are supported by the evidence presented, coupled with its credibility determinations clearly substantiate the conclusion that aggravating circumstances existed. In fact, Father admits that he was waiting until he was on parole to try to "re-establish" a relationship. This in itself is a questionable assertion merely because Father was incarcerated before the child's birth and had no relationship to "re-establish." The few letters and phone calls Father initiated all followed the April 8, 2002 permanency hearing at which time the goal was initially changed to adoption. With nothing more to show that he "maintained substantial and continuing contact with the child," the court's finding of aggravated circumstances is supported. Moreover, the trial court's conclusion that the change of goal to adoption was in the child's best interests was formulated with reliance on the fact that no bond existed between Father and son and that Father made no effort or no significant effort to contact the child until the decision was made to change the goal. This decision also rested on the recognition that the child had bonded with his foster family and was doing very well in that placement. By changing the goal and allowing adoption, the court concluded that this would give "this child the best chance to succeed and live a happy and productive life." T.C.O. at 11. We agree and conclude that Father's first two issues are without merit.
¶ 9 Father next argues that it is a violation of his constitutional rights for the Agency and/or the Guardian Ad Litem to file a petition to terminate his parental rights while the placement plan remained in reunification status, i.e., before a final adjudication resulted in a change of goal. Father relies on Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), asserting that "[u]nder the mandates of Santosky the State has a requirement to preserve the unity of the family and may only deviate from that mandate `when it is clear that the natural parents cannot or will not provide sufficient care for the child.' " Father's brief at 21 (quoting In re Adoption of A.M.B., 812 A.2d 659, 670 (Pa.Super.2002)). Based on this assertion, Father contends that filing a termination petition prior to a final adjudication of a goal change violates his fundamental rights. Father also argues that if in fact 23 Pa.C.S. § 2512 allows a termination petition to be filed before a goal change has been finalized then that section of the statute is unconstitutional.
¶ 10 The trial court discussed this issue by stating that the Santosky case only requires that "a state must impose a burden of proof of at least clear and convincing evidence in a proceeding to terminate parental rights." T.C.O. at 12. After Indicating that that was the burden it imposed, the court noted that "Santosky articulates the general proposition that a parent's interest in the care of his or her children is a `fundamental liberty interest protected by the Fourteenth Amendment,'" and that "[c]onsistent with the mandates of the Santosky case the Pennsylvania statutes provide various procedural safeguards for parents." Id. Our interpretation of Santosky coincides with the trial court's interpretation, and the A.M.B. opinion likewise makes clear that procedural due process is required as is the *975 imposition of the clear and convincing evidence burden.
¶ 11 Further, in response to this issue, the Agency points out that at a permanency hearing:
if the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the home or to preserve and reunify the family need not be made or continue to be made, [the court shall] determine whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child....
42 Pa.C.S. § 6351(f)(9) (emphasis added). The Agency contends that, although it may file a termination petition before the child is in care for 15 months, based upon this provision in the Juvenile Act, it "is mandated by statute to file a petition for termination of parental rights if the child has been in care for fifteen (15) of the last twenty-two (22) months and certain conditions exist." Agency's brief at 9. Moreover, the Agency notes that the child here was in care for almost 15 months at the time the petition to terminate was filed, and one year and nine months by the hearing date. The Agency further observes that Father's due process rights were protected in that he was afforded the adjudication hearing, regular review hearings, a hearing on his exceptions to the goal change and on the petition to terminate his parental rights. Father was also represented by counsel and had the opportunity to present evidence.
¶ 12 However, the Agency's most important point centers on the impact of the passage of the Adoption and Safe Families Act (ASFA), 42 U.S.C. § 671 et seq., which occurred after Santosky was decided. Pursuant to the requirements of the ASFA, Pennsylvania amended the Juvenile Act. Specifically, the 1998 amendment to section 6301 added the following language to clarify the purpose of Chapter 63 of the Juvenile Act:
(b) Purposes. This chapter shall be interpreted and construed as to effectuate the following purposes:
(1) To preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.
42 Pa.C.S. § 6301(b)(1). See In re J.I.R., 808 A.2d 934, 936 (Pa.Super.2002) (stating that the agency "petitioned for a change of goal from reunification to adoption and filed a petition for termination").
¶ 13 Furthermore, in In re B.L.L., 787 A.2d 1007, 1016 (Pa.Super.2001), this Court discussed Pennsylvania law in connection with the ASFA, indicating that the policy of both the state and federal statutes is "to remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family." The B.L.L. court further explained:
States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation *976 in the Adoption and Safe Families Act of 1997 (Public Law 105-89, 111, stat. 2119). Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.
Id. See also In the Interest of H.S.W.C.-B., 575 Pa. 473, 836 A.2d 908, 911 (2003) (stating that "[p]roposed goal changes and petitions to terminate parental rights petitions are often sought concurrently; one cannot seek to terminate parental rights if the goal is still reunification").
¶ 14 It is apparent to this Court that our Supreme Court in H.S.W.C.-B. considered an agency's simultaneous requests for a goal change and a termination of parental rights to be proper. See id. In the instant case, Father was entitled to and received his procedural due process rights, having had the opportunity to attend various hearings, present evidence, and cross-examine the Agency's witnesses in connection with both petitions. He was also represented by an attorney. Furthermore, his assertion that 23 Pa.C.S. § 2512 is unconstitutional because it allows the concurrent filing of a termination petition and a request for goal change is baseless. That section does not even mention goal changes or time frames for the filing of termination petitions. It merely addresses "who may file" a termination petition and what the "contents" of the petition should be. Rather, 42 Pa.C.S. § 6351(f)(9) permits for the dual filing and Father has not attacked that provision. Accordingly, we conclude that Father's third issue is without merit.
¶ 15 Father's final issue concerns the trial court's decision to grant the Agency's petition to terminate Father's parental rights to G.R. Father again relies on his own testimony reciting the efforts he made while in prison to take courses and programs that were offered so that he could address his own problems in order to be a fit parent when he was released. Although Father admits that he could have done a better job, he asserts that "he vigorously performed the parental duties that he was able to do." Father's brief at 24.
¶ 16 These arguments are essentially an attack on the credibility determination and the weight accorded the testimony by the trial court, and we will not disturb these decisions absent an abuse of discretion. The trial court found that in the six-month period prior to the filing of the termination petition Father "had no contact with the child and made absolutely no attempt to perform his parental duties." T.C.O. at 7.[5] Additionally, the court reiterated that "[F]ather's actions in this matter are devoid of any legitimate attempt to maintain contact with the child, and there is no legally acceptable explanation for his conduct." T.C.O. at 8. In formulating this determination, the trial court applied the following recitation of the law:
It is incumbent upon a parent when separated from his child to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life. In re: V.E., 417 Pa.Super. 68, 76, 611 A.2d *977 1267, 1271 (1992). Where the child is in foster care, this affirmative duty requires the parent to work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for him to be capable of performing his parental duties and responsibilities. See In re: William L., 477 Pa. 322, 334, 383 A.2d 1228, 1233-1235 (1978).
The Court must consider all of the circumstances in determining whether or not father has met his obligations and must evaluate his performance in light of what would be expected of someone in similar circumstances. In re: V.E., supra. If there are obstacles in the way of his performing parental duties, father must exercise reasonable firmness in declining to yield to them or his parental rights may be forfeited. Id. Although he is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. In re: Burns, 474 Pa. 615, 624, 379 A.2d 535, 541 (1977).
T.C.O. at 7. Based on the above statements of the law and our review of the record, which reveals that sufficient competent evidence supports the court's findings, we conclude that Father's last issue also has no merit.[6]
¶ 17 For the reasons stated above, we conclude that the order confirming the change of goal was proper and that the grant of the petition to terminate Father's parental rights was supported by the record. The trial court did not abuse its discretion or err in applying the law. Accordingly, we affirm the trial court's orders in this matter.
¶ 18 Orders affirmed.
NOTES
[1] The Agency's petitions were also directed at A.R. (Mother), the child's natural mother. However, she voluntarily relinquished her parental rights and, therefore, is not a party to this appeal.
[2] By per curiam order dated August 20, 2003, this Court consolidated Father's appeals.
[3] See duplicate Trial Court Orders, dated August 2, 2002 and August 6, 2002.
[4] See Court Order and Decree both dated June 30, 2003.
[5] We recognize that Father did send one letter to G.R. on June 25, 2002. The three other letters Father sent were dated after the termination petition was filed.
[6] We also note for Father's edification that:

[I]ncarceration of a parent does not, in itself, provide sufficient grounds for termination of parental rights; however, an incarcerated parent's responsibilities are not tolled during his incarceration. Parental rights may not be preserved by waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities. Further, parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.
In re J.I.R., 808 A.2d at 938 (quoting In the Interest of C.S., 761 A.2d 1197, 1201 (Pa.Super.2000)).