J-S38029-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: C.S., A MINOR AND J.D., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: H.S., NATURAL PARENT | : : : : : : | |
| | : | No. 316 WDA 2018 |

Appeal from the Order January 16, 2018
In the Court of Common Pleas of Cambria County Domestic Relations at
No(s): CP-11-DP-0000149-2016,
CP-11-DP-0000150-2016

BEFORE: BOWES, J., NICHOLS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY NICHOLS, J.: FILED DECEMBER 14, 2018

H.S. (Mother), appeals from the orders entered on January 16, 2018, changing the permanency goal of her minor, male, dependent children, C.S. (born in December of 2014), and J.D. (born in May of 2010),[1] (collectively, the Children), from "return home" to "permanency through adoption" under the Juvenile Act, 42 Pa.C.S. § 6351. We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Children have different fathers. Trial Ct. Op., 3/22/18, at 1 n.2. The trial court noted that Brittney Corson, the caseworker for the Cambria County Children and Youth Services (CYS or the Agency), testified that the issues that had brought the Children into care had not been alleviated by either parent for each child, that neither father was able to meet the needs of the Children, nor would they be able to do so in the foreseeable future. Id. at 10. Neither father has appealed the goal change order, nor is either father a party to the instant appeal.

The trial court ably summarized the relevant factual background to this matter at the permanency review hearing held on January 12, 2018:

H.S. [Mother] . . . is the natural mother of J.D. and C.S. Services to the family were initiated in August 2016 due to homelessness of the family, mental health issues of Mother and J.D., drug and alcohol issues of Mother and her then paramour [R.W.], lack of medical care for [C]hildren, development concerns, and domestic violence concerns. [C]hildren were removed from Mother's care [on] August 24, 2016, by way of a voluntary placement agreement[,] with J.D. being placed with a family friend[,] and C.S. being placed in foster care because of the family friend's inability to care for both children. [On September 28, 2016, the trial court entered orders adjudicating the Children dependent pursuant to 42 Pa.C.S. § 6302(1). The trial court appointed Paul Eckenrode, Esq., as Children's guardian ad litem (GAL).[2]]

_____

[2] See 42 Pa.C.S. § 6311(a). Because this is a dependency action rather than a contested termination of parental rights (TPR) proceeding, Section 6311(a) requires the appointment of GAL "to represent the legal interests and the best interests of the child." Id. (emphasis added). In contrast, in the TPR context, our Supreme Court addressed in In re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017) (plurality), "whether 23 Pa.C.S. § 2313(a), which mandates the appointment of counsel for children involved in contested involuntary [TPR] proceedings, is satisfied by the appointment of a [GAL] provided that the GAL is an attorney." L.B.M., 161 A.3d at 174. In L.B.M.,

a majority of the Court agreed on several points: (a) in the context of contested [TPR] proceedings, the first sentence of Section 2313(a) requires that the common pleas court appoint an attorney to represent the child's legal interests, i.e., the child's preferred outcome; (b) where there is a conflict between the child's legal interests and his best interests, [a GAL], who advocates for the child's best interests, cannot simultaneously represent the child's legal interests.

In re T.S., ___ A.3d ___, 2018 WL 4001825, at *1 (Pa. filed Aug. 22, 2018).

In T.S., our Supreme Court re-visited L.B.M. The T.S. Court held that the trial court did not err in allowing the children's GAL to act as their counsel

* * *

> Brittney Corson (Corson) testified that she is the CYS caseworker assigned to the family. Corson testified that the concerns related to Mother at the time services were initiated included: homelessness; financial instability; domestic violence; Mother's mental health needs; Mother's drug use; and Mother's inability to meet the needs of the children. Corson testified that she had many of the same concerns in January 2018 as exi[s]ted in August of 2016 including: Mother was in the process of being evicted and would again become homeless; unstable relationships with men

_____

during the termination proceeding because, at two and three years old, the children were incapable of expressing their preferred outcome. T.S., 2018 WL 4001825, at *7. The Court explained that Section 2313(a) was satisfied by the representation of the children by the GAL because "if the preferred outcome of [the children is] incapable of ascertainment because [they are] very young and pre-verbal, [then] there can be no conflict between the [children's] legal interests and his or her best interests." Id. at *10. In such circumstances, the T.S. Court concluded that there was no conflict of interest between the children's best and legal interests.

L.B.M. has been raised sua sponte by this Court in TPR proceedings. At the time of the proceedings at issue in the instant appeal, however, the holding in L.B.M. had not been extended beyond the TPR context. While this appeal was pending, this Court extended the requirements of L.B.M. and its progeny to a dependency action in which the mother of a sixteen-year-old girl raised the issue of whether legal counsel should have been appointed for the girl, whose legal interests conflicted with the GAL's view of her best interests. See In re J'K.M., 191 A.3d 907, 915 & n.9 (Pa. Super. 2018). However, J'K.M. did not extend that portion of L.B.M. and its progeny that requires sua sponte review of the appointment of legal counsel. Indeed, as this Court made clear in J'K.M., the issue had been raised by a party to the dependency proceeding, namely the mother. Id. We note that no party has raised an issue regarding the appointment of legal counsel for Children in the instant dependency proceeding. Moreover, there is no indication of a conflict between the best and legal interests of Children. Accordingly, we decline to consider sua sponte whether legal counsel was required for Children in this dependency proceeding.

with a history of domestic violence; failure to treat mental health or drug use issues; and unstable employment resulting in financial instability. Corson testified that [C]hildren had been in placement for sixteen months with the parents making little progress in alleviating the concerns that brought [C]hildren into care.

Corson testified that since services began Mother has been provided with numerous services including: CYS caseworker services; supervised visitation including home visits with visit coaching services; social work services; family engagement; home management services; JustCare home services; drug and alcohol assessments; medication management and counseling through Nulton [Diagnostic Treatment Center (Nulton)] and ACRP; and assistance with obtaining aid from the Pennsylvania Department of Public Welfare. Corson testified that Mother had briefly lived with B.C., the father of C.S., during which time she had stable housing but that B.C. had been incarcerated for a probation violation related to domestic violence involving Mother and Mother's situation deteriorated after that. She testified that following B.C.'s incarceration[,] Mother resumed a relationship with [R.W.] who Mother had been seeing at the time services were initiated in 2016. Relative to [R.W.], Corson testified that he had refused to cooperate with CYS in the past, refused to cooperate with the agency now, there were concerns related to domestic violence between him and Mother, and concerns related to his drug use. Further, both fathers indicated that they did not want [R.W.] around their children.

Corson testified that Mother was barely able to care for herself and meet he[r] own needs because of continued housing issues, financial instability despite working two jobs, [and] not addressing her mental health needs or drug use issues. Corson testified that Mother continued to put her needs before [C]hildren's as demonstrated by her choice to continue a relationship with [R.W.] despite Corson directing her not to and her continued drug use. Finally, Corson opined that at present, the issues that brought [C]hildren into care had not been alleviated by any parent and that neither Mother nor either father was able to meet the needs of the children, nor would they be able to do so in the foreseeable future.

Dennis Kashurba (Kashurba) testified that he is a licensed psychologist who performed an evaluation on Mother in June 2017 after reviewing the record of CYS and Mother's treatment records from Nulton[.] Kashurba testified that during her treatment with

Nulton, Mother was diagnosed with anxiety disorder, depressive disorder, a learning disorder, panic disorder, and [post-traumatic stress disorder (PTSD)]. He testified that as a result of his own testing and evaluation Mother showed elevations in persecutory ideation and impulse expression. Kashurba testified that as a result of his evaluation he had recommended various services for Mother to alleviate CYS' concerns and help her regain her children including: continued mental health treatment with medication management; home management services; supervised visitation with parenting coaching; drug treatment with continued drug screens; and family engagement services.

Kashurba testified that he was aware that Mother had produced a drug screen positive for cannabis prior to the hearing and that he had been present [for] the testimony of Corson. Kashurba testified that based on his evaluation, Corson's testimony, and the positive drug screen it appeared that Mother had continued her lifestyle without change from the date of his evaluation. He testified that given her history[,] Mother would be unable to address her mental health issues or drug use issues within the next year but would need continued treatment. Kashurba opined that based upon all information available to him[,] Mother was unable to care for her children at that time and that she was unlikely to be able to do so in the foreseeable future.

Mother testified that[] she loves her children and is doing all she can to regain custody of them. Relative to her financial situation[,] Mother testified that she is working two jobs but cannot meet her financial obligations because she has to pay for [C]hildren's[] foster care. Mother explained that she was in the process of being evicted for failure to pay rent and that a local agency had offered to pay the back rent but the landlord refused to allow her to stay because he knew she could not afford the rent going forward. Mother acknowledged that she would not be able to pay future rent without assistance. Mother testified that she would stop her relationship with [R.W.] if she got her children back. Mother testified that she was in the process of resuming mental health treatment and had an appointment scheduled with ACRP for early February to begin counseling and medication management. She acknowledged that she was not presently taking her prescribed medication but asserted it was related to an issue with the prescription not her desire not to comply. Finally, she testified that she would do whatever CYS asked her to do in order to regain custody of [C]hildren.

Trial Ct. Op., 3/22/18, at 1, 8-11 (citations and footnote omitted).

Following the January 12, 2018 hearing, the trial court

entered Orders changing the goals of [C]hildren from return home to permanency through adoption. The [trial court] made Findings of Fact that, inter alia, included: none of the parents were placement options; no parent had alleviated the concerns that necessitated placement and will not do so in the foreseeable future; the parents had failed to comply with the permanency plan requirements and [c]ourt[-]ordered services; no parent could provide for the long[-]term health, safety and welfare of [C]hildren; Cambria County Children and Youth Services (CYS) had exhausted all services to remedy the reasons for placement; [C]hildren have been in placement for 16 months with no substantial change in the situation of any parent; [C]hildren needed a stable environment in which to develop; Mother continues to have housing issues and was in the process of being evicted; Mother continues to have financial instability and is unable to meet her or [C]hildren's needs; Mother had failed to address her mental health issues; Mother failed to address her drug issues and continued to use illegal drugs; Mother continued to place her needs before [C]hildren; Mother continued to choose inappropriate paramours[,] resulting in ongoing domestic violence concerns; and that a goal change to adoption was in the best interest of [C]hildren.

Id. at 1-2 (citations and footnote omitted).

On February 23, 2018, Mother timely filed a notice of appeal, and, on March 2, 2018, Mother filed a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

_____

[3] We decline to find waiver based on Mother's failure to file a Rule 1925(b) concise statement simultaneously with her notice of appeal. See In re K.T.E.L., 983 A.2d 745, 747-48 (Pa. Super. 2009) (finding that the appellant's failure to simultaneously file a Rule 1925(a)(2) concise statement did not result in waiver of all issues for appeal where the appellant later filed the statement, and there was no allegation of prejudice from the late filing); cf.

Mother raises the following issue: "Whether the trial court erred and/or abused its discretion when it changed the permanency goal for the minor children from 'Return Home' to 'Adoption.'" Mother's Brief at 4.

Mother contends that she had made the necessary progress to return the Children to her or to give her additional time to make progress toward the goal of returning them to her. Id. at 6. Mother asserts that the testimonial evidence at the permanency review hearing established that she has been consistently employed throughout the duration of the dependency case and has shown the ability to locate appropriate housing. Id. Additionally, Mother has been evaluated by an appropriate drug and alcohol treatment program, and she has not been recommended to receive any additional treatment. Id. Mother claims that she has consistently and appropriately visited the Children. Id.

The Pennsylvania Supreme Court recently set forth our standard of review in a dependency case as follows:

> The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion[.]

_____

J.P. v. S.P., 991 A.2d 904, 908 (Pa. Super. 2010) (finding that the appellant waived issues for appeal by failing to comply with the trial court's order directing her to file a Rule 1925(b) Statement within 21 days).

In re L.Z., 111 A.3d 1164, 1174 (Pa. 2015) (internal quotation marks and citations omitted).

Section 6302 of the Juvenile Act defines a "dependent child" as:

[a] child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302.

In In re G., T., 845 A.2d 870 (Pa. Super. 2004), this Court further clarified the definition of "dependent child":

The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

G., T., 845 A.2d at 872 (internal quotation marks and citations omitted); see also In re J.C., 5 A.3d 284, 289 (Pa. Super. 2010). Additionally, we note that "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." G., T., 845 A.2d at 872 (citation omitted).

With regard to a dependent child, in In re D.A., 801 A.2d 614 (Pa. Super. 2002) (en banc), this Court explained:

[A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

D.A., 801 A.2d at 617 (citation omitted).

Regarding the disposition of a dependent child, Section 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

Section 6351(e) of the Juvenile Act provides in pertinent part:

(e) Permanency hearings.—

(1) [T]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. . . .

(2) If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian

or custodian or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as provided in paragraph (3).

42 Pa.C.S. § 6351(e)(1)-(2).

Section 6351(f) of the Juvenile Act prescribes the pertinent inquiry for the reviewing court:

(f) Matters to be determined at permanency hearing.—

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

(7) If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

* * *

(f.1) Additional determination.—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the

safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and wiling relative.

(f.2) Evidence.— Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

(g) Court order.— On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child. . . .

42 Pa.C.S. § 6351 (emphasis added).

After our careful review of the record in this matter, we conclude that the trial court's factual determinations are supported by competent evidence, and we discern no error in the court's legal conclusion to change the goal for Children from reunification to adoption. See L.Z., 111 A.3d at 1174.

Accordingly, we affirm the permanency review order and goal change order of the trial court based on the well-reasoned opinion of President Judge Norman A. Krumenacker, III, filed on March 22, 2018.

Order affirmed.

Judge Bowes concurs in the result.

Judge Strassburger files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2018

**IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
JUVENILE DIVISION**

IN THE MATTER OF:

J.D.

C.S.

Appeal of H.S., the Natural Mother

CP-11-DP-0000149-2016

CP-11-DP-0000150-2016

Opinion Pursuant to Rule of Appellate
Procedure 1925(a)(2)

# OPINION PURSUANT TO RULE OF APPELLATE

# PROCEDURE 1925 (a)(2)

**Krumenacker, P.J.:** H.S.(Mother) the appellant herein, is the natural mother of J.D. and

C.S.[1] Services to the family were initiated in August 2016 due to homelessness of the family,

mental health issues of Mother and J.D., drug and alcohol issues of Mother and her then

paramour Robert Wilde (Wilde), lack of medical care for the children, development concerns,

and domestic violence concerns. The children were removed from Mother's care August 24,

2016, by way of a voluntary placement agreement with J.D. being placed with a family friend

and C.S. being placed in foster care because of the family friend's inability to care for both

children.

After a hearing on January 12, 2018, this Court entered Orders changing the goals of

all the children from return home to permanency through adoption. The Court made Findings

of Fact that, *inter alia*, included: none of the parents[2] were placement options; no parent had

alleviated the concerns that necessitated placement and will not do so in the foreseeable

---

[1] Since the subjects of this appeal are juveniles they will be referred to by their initials.

[2] J.D. and C.S. have different fathers.

future; the parents had failed to comply with the permanency plan requirements and Court ordered services; no parent could provide for the long term health, safety, and welfare of the children; Cambria County Children and Youth Service (CYS) had exhausted all services to remedy the reasons for placement; the children have been in placement for 16 months with no substantial change in the situation of any parent; the children needed a stable environment in which to develop; Mother continues to have housing issues and was in the process of being evicted; Mother continues to have financial instability and is unable to meet her or the children's needs; Mother had failed to address her mental health issues; Mother failed to address her drug use issues and continued to use illegal drugs; Mother continued to place her needs before the children; Mother continued to choose inappropriate paramours resulting in ongoing domestic violence concerns; and that a goal change to adoption was in the best interest of the children. N.T. 1/12/18 pp. 54-56.

Mother timely filed Notice of Appeal and submitted a Concise Statement of Errors Complained of on Appeal (Concise Statement) pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), which raises the sole issue of:

1. Did the Court err or abuse its discretion by finding that clear and convincing evidence existed to change the goal from return to Mother to adoption?

For the reasons discussed below the appeal should be dismissed and the Court's Orders of January 16, 2018, should be affirmed.

# DISCUSSION

Mother's allegation of error relates to the Court's determination that a change in goal to adoption was necessary and appropriate to meet the needs of the children and was the safest and least restrictive placement. In its opening provisions, the Juvenile Act (Act) provides that

one of its fundamental purpose is "[t]o preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained" 42 Pa. C.S. § 6301(b)(1), and a child who has been adjudicated dependent may be separated from its parents only upon a showing of clear necessity. Thus, the situations in which the state may intervene are limited, and its burden is very heavy. These restrictions derive from the interrelated beliefs that the family is one of our most important institutions, that a child's best interest is served by being raised within the family, and that the state should not unnecessarily intrude upon, and thereby weaken, the family.

While the primary goal of the Act is to preserve and reunite the family, it goes far beyond that opening statement of purpose. The Act also requires and provides a vehicle by which the court can remove children from the family environment when necessary for their welfare or in the interest of public safety. The Superior Court has stated that "[w]hile deference must be given to this laudatory goal, deference should not become rigid adherence to the principle regardless of the circumstances; otherwise, adoption will never be an option regardless of the family situation and the best interests of the child." *In re:* J.S.W., 438 Pa. Super. 46, 54, 651 A.2d 167 170-71 (1994).

Once intervention by the state has occurred, the child stands in a different relationship to the parents than a child in an intact family whose rights are protected and whose needs are fulfilled by his parents. Removal of a child from his parents by the state can only occur on proof of neglect or dependency on the standard of clear and convincing evidence, Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982), and upon establishment of clear necessity following petition, notice and hearing with the parent and child having the assistance of counsel. See also, 42 Pa. C.S. §§ 6301-6375 (Juvenile Act); Helsel v. Blair

County Children and Youth Serv., 359 Pa. Super. 487, 519 A.2d 456 (1986) (standard for adjudicating a child dependent is "clear and convincing evidence", as well as a showing of clear necessity). Once the child has been removed from the home it becomes the duty of the court to do that which its parents have failed to do and provide those things that are in his or her best interest. Accordingly, once a child has been removed from its parents the issues of custody, continuation of foster care and appropriateness of the goal are determined according to a child's best interests. *In re:* Miller, 380 Pa. Super. 423, 552 A.2d 261 (1988).

The role of the court in cases such as this was summarized in the case of Petition of Frank B. Bort, 25 Kan. 308, 37 Am. Rep. 255, when Justice Brewer, of the Supreme Court of Kansas, later a United States Supreme Court Justice, wrote:

> when the custody of children is the question, that the best interest of the children is the paramount fact. Rights of father and mother sink into insignificance before that. Even when father and mother are living together, a court has the power, if the best interests of the child require it, to take it away from both parents, and commit the custody to a third person. In other words, a court of chancery stands as a guardian of all children, and may interfere at any time, and in any way, to protect and advance their welfare and interests.

*In re:* Rosenthal, 103 Pa. Super. 27, 32-33, 157 A. 342, 343 (quoting Petition of Frank B. Bort, 25 Kan. 308 (1881)). In the case *sub judice*, both fathers and Mother failed to live up to their duties as parents and the state has been forced to intervene to protect their children and ensure that their needs are met and that they are afforded the opportunity to enjoy a stable family life and to develop to the fullest extent of their potential.

In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. *In re:* M.S., 980 A.2d 612 (Pa. Super. 2009); *In re:* A.K., 936 A.2d 528, 532–533 (Pa. Super. 2007); *In re:* G.T., 897 A.2d 1197 (Pa. Super. 2006). The burden is on the agency to prove the *change* in

goal would be in the child's best interest. *In re* Interest of M.B., 449 Pa. Super. 507, 674 A.2d 702, 704 (1996) (citing In Interest of Sweeney, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990)). Our Superior Court has explained that

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act, which was amended in 1998 to conform to the federal Adoption and Safe Families Act (ASFA). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

*In re* N.C., 909 A.2d 818, 823 (Pa. Super. 2006)(emphasis in original)(internal citations omitted). In contrast, in a termination of parental rights proceeding, the focus is on the conduct of the parents as assessed against 23 Pa. C.S. § 2511. *In re* M.B., 674 A.2d at 705.

Regarding permanency, sections 6351(f), (f.1), and (g) of the Act provide in pertinent part:

> **(f) Matters to be determined at permanency hearing.--** At each permanency hearing, a court shall determine all of the following:
>
> (1) The continuing necessity for and appropriateness of the placement.
>
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
>
> (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
>
> (4) The appropriateness and feasibility of the current placement goal for the child.
>
> (5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

…

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

> (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

> (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

…

**(f.1) Additional determination.**--Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

…

**(f.2) Evidence.**--Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at

risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**--On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351.

Further, the Adoption and Safe Families Act, 42 U.S.C. §§ 671–679c, imposes upon states the requirement to focus on the child's needs for permanency rather than the parent's actions and inactions. The amendments to the Act pursuant to this federal legislation provide that a court shall determine certain matters at the permanency hearing, including whether the child has been placed into foster care for 15 out of the last 22 months. See, 42 Pa. C.S. § 6351(f)(9). With regard to permanency planning, the Legislature contemplated that, after reasonable efforts have been made to reestablish the biological relationship, the process of the agency working with foster care institutions to terminate parental rights should be completed within eighteen months. See, *In re: N.W.* , 859 A.2d 501, 508 (Pa.Super.2004) (citing *In re: G.P.R.*, 851 A.2d 967, 976 (Pa. Super. 2004)).

As the Superior Court has consistently held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re: N.C.*, 909 A.2d at 824 (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003)). Further, "if a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time, the agency has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." In Interest of Lilley, 719 A.2d 327, 332 (Pa. Super. 1998) (citing *In re: J.W.*, 396 Pa. Super. 379, 578 A.2d 952 (1990)).

Relative to the standard of review on appeals from a goal change proceeding, our Superior Court has explained that

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. *In re: G.P.R.*, 851 A.2d 967, 973 (Pa. Super. 2004). In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. Id. (citation omitted). We are bound by the trial court's findings of fact that have support in the record. Id. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. *In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa. Super. 2006). When the trial court's findings are supported by competent evidence of record, we will affirm "even if the record could also support an opposite result." Id. (quoting *In re In the Interest of S.H.*, 879 A.2d 802, 806 (Pa. Super. 2005), *appeal denied*, 586 Pa. 751, 892 A.2d 824 (2005)).

*In re*: N.C., 909 A.at 822–23.

The testimony presented at the January 12th hearing reveals that: while Mother made minimal progress in addressing some issues facing her she has not alleviated all the concerns that necessitated placement and cannot do so in the foreseeable future; Mother continues to have drug issues as shown by a positive drugs screen the day of the hearing; Mother continued to have mental health issues that she fails to address; Mother continues to engage in relationships that place her at risk for becoming a victim of domestic violence; and Mother continues to have financial issues that prevent her from providing a stable environment for the children. N.T. 1/12/18.

Brittney Corson (Corson) testified that she is the CYS caseworker assigned to the family. N.T. 1/12/18 p. 4. Corson testified that the concerns related to Mother at the time services were initiated included: homelessness; financial instability; domestic violence; Mother's mental health needs; Mother's drug use; and Mother's inability to meet the needs of

the children. Id. p. 5. Corson testified that she had many of the same concerns in January 2018 as exited in August of 2016 including: Mother was in the process of being evicted and would again become homeless; unstable relationships with men with a history of domestic violence; failure to treat mental health or drug use issues; and unstable employment resulting in financial instability. Id. pp. 5-6. Corson testified that the children had been in placement for sixteen months with the parents making little progress in alleviating the concerns that brought the children into care. Id.

Corson testified that since services began Mother has been provided with numerous services including: CYS caseworker services; supervised visitation including home visits with visit coaching services; social work services; family engagement; home management services; JustCare home services; drug and alcohol assessments; medication management and counseling through Nulton and ACRP; and assistance with obtaining aid from the Pennsylvania Department of Public Welfare. Id. pp. 4-12; Pet'r.'s Ex. 7. Corson testified that Mother had briefly lived with B.C., the father of C.S., during which time she had stable housing but that B.C. had been incarcerated for a probation violation related to domestic violence involving Mother and Mother's situation deteriorated after that. Id. p.6; Pet'r.'s Ex 1. She testified that following B.C.'s incarceration Mother resumed a relationship with Wilde who Mother had been seeing at the time services were initiated in 2016. Id. Relative to Wilde, Corson testified that he had refused to cooperate with CYS in the past, refused to cooperate with the agency now, there were concerns related to domestic violence between him and Mother, and concerns related to his drug use. Id. pp. 6-7. Further, both fathers indicated that they did not want Wilde around their children. Id.

Corson testified that Mother was barely able to care for herself and meet he own needs because of continued housing issues, financial instability despite working two jobs, not addressing her mental health needs or drug use issues. Id. p. 13. Corson testified that Mother continued to put her needs before the children's as demonstrated by her choice to continue a relationship with Wilde despite Corson directing her not to and her continued drug use. Id. Finally, Corson opined that at present, the issues that brought the children into care had not been alleviated by any parent and that neither Mother nor either father was able to meet the needs of the children, nor would they be able to do so in the foreseeable future. Id. p. 12-13.

Dennis Kashurba (Kashurba) testified that he is a licensed psychologist who performed an evaluation on Mother in June 2017 after reviewing the record of CYS and Mother's treatment records from Nulton Diagnostic Treatment Center (Nulton). Id. pp. 24-25. N.T. Kashurba testified that during her treatment with Nulton, Mother was diagnosed with anxiety disorder, depressive disorder, a learning disorder, panic disorder, and PTSD. Id. He testified that as a result of his own testing and evaluation Mother showed elevations in persecutory ideation and impulse expression. Id. p. 26. Kashurba testified that as a result of his evaluation he had recommended various services for Mother to alleviate CYS' concerns and help her regain her children including: continued mental health treatment with medication management; home management services; supervised visitation with parenting coaching; drug treatment with continued drug screens; and family engagement services. Id. p. 27.

Kashurba testified that he was aware that Mother had produced a drug screen positive for cannabis prior to the hearing and that he had been present from the testimony of Corson. Id. pp. 26-27. Kashurba testified that based on his evaluation, Corson's testimony, and the positive drug screen it appeared that Mother had continued her lifestyle without change from

the date of his evaluation. Id. p. 26. He testified that given her history Mother would be unable to address her mental health issues or drug use issues within the next year but would need continued treatment. Id. p. 28. Kashurba opined that based upon all information available to him Mother was unable to care for her children at that time and that she was unlikely to be able to do so in the foreseeable future. Id.

Mother testified that: she loves her children and is doing all she can to regain custody of them. Id. pp. 38-49. Relative to her financial situation Mother testified that she is working two jobs but cannot meet her financial obligations because she has to pay for the children's' foster care. Id. pp. 38-40. Mother explained that she was in the process of being evicted for failure to pay rent and that a local agency had offered to pay the back rent but the landlord refused to allow her to stay because he knew she could not afford the rent going forward. Id. Mother acknowledged that she would not be able to pay future rent without assistance. Id. Mother testified that she would stop her relationship with Wilde if she got her children back. Id. pp. 40-41. Mother testified that she was in the process of resuming mental health treatment and had an appointment scheduled with ACRP for early February to begin counseling and medication management. Id. She acknowledged that she was not presently taking her prescribed medication but asserted it was related to an issue with the prescription not her desire not to comply. Id. Finally, she testified that she would do whatever CYS asked her to in order to regain custody of the children. Id. pp. 42-44.

It is clear from the testimony presented that: Mother love her children; Mother has failed to alleviate the original concerns that resulted in the placement of her children after more than 16 months of services; the children have been in care for a period of time in excess of 15 months; Mother has mental health issues that require ongoing treatment and that she has

failed to obtain that treatment; Mother continues to use illegal drugs and has not addressed her addiction with treatment; Mother continues to lack stable housing; Mother continues to engage in relationships that place her safety at risk, and would place the children in risk if they were in her care, despite being told to end the relationships; Mother's financial situation makes it impossible for her to meet her own needs let alone those of the children; and Mother is unlikely to address these concerns in the foreseeable future. Considering all these factors it is clear that Mother has been unable to overcome the concerns that resulted in the placement of the children and is unlikely to overcome these concerns in the foreseeable future. To continue on a course towards reunification with little to no possibility that Mother will alleviate these concerns is not in the best interest of the children and will only serve to keep them in foster care rather than allowing them to obtain a permanent and stable home through adoption. See, In re D.P., 972 A.2d 1221 (Pa. Super. 2009)(evidence was sufficient to support changing goal to adoption instead of reunification; mother failed to work consistently to support reunification with children, failed to provide adequate supervision, failed to ensure children attended therapist appointments, invited unauthorized persons, including a convicted felon and fugitive, to stay at her home with children present, consumed illegal drugs in presence of son, and failed to cooperate with agency and withheld information necessary to assure children's safety, because of mother's behavior, children were in foster care for more than three years, and mother was given more than sufficient time to become dutiful parent).

The Act offers no guidance regarding the duration that services must be offered to a family prior to seeking a goal change. Because of the Act's goal to preserve family unity whenever possible, the Superior Court has held that "when there are inadequacies in the child's home ... [the state agency should] take the steps necessary to instruct the parents in the

skills needed, and provide follow-up supervision in the home, where feasible." In the Interest of Whittle, 263 Pa. Super. 312, 316, 397 A.2d 1225, 1226 (1979). However, that court has also recognized that such services are costly and that an agency's resources are not unlimited. In the Interest of M.A., 365 Pa. Super. 179, 183, 529 A.2d 31, 33 (1987), appeal denied, 517 Pa. 620, 538 A.2d 874 (1988) ("Just as a child cannot expect his natural parents to have unlimited resources, so too, the Commonwealth in its role as *parens patriae* cannot be expected to provide unlimited resources for the benefit of all those who may arguably need them."). Accordingly, an agency need not offer services indefinitely, particulary where the parents, such as Mother, fail to afford themselves of the benefits of those services by refusing to cooperate or follow through with services.

It is well settled that both the constitution of the United States of America and the Pennsylvania Constitution recognize a protected right to have and raise children. As with any constitutional right, however, it is circumscribed by duties and when the fulfillment of duties and responsibilities upon which the right is founded are not implemented, the right must fail.

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life'.

*In re* Shives, 363 Pa. Super. 225, 229, 525 A.2d 801, 803 (1987) (quoting *In re* Burns, 474 Pa. 615, 624, 379 A.2d 535, 540 (1977) (citations omitted)). Should a parent fail to live up to

their duties the state, as *parens patriae*, has provided a means for intervention to protect the child through the vehicle of the Act.

Here, as discussed above, Mother is unable due to her ongoing issues to live up to her duty. The goal of reunification is a laudable one and should be strived for so long as it is a realistic goal. However the Act recognizes that when it is no longer realistic to expect reunification, the goal must be changed to that which will ensure the safety of the children and allow them to achieve a permanent and stable home life thus allowing the limited resources of the state to be redirected to those for who hope of reunification remains. See, 42 Pa. C.S. § 6301(b). In the end, the courts have been charged with doing that which is in the best interests of the children of the Commonwealth, even where doing so may cause others to suffer the loss of family.

Unless the goal was set to one that would allow these children to achieve a level of permanency only afforded by adoption, these children faced a lengthy stay in foster care with only a remote chance of returning home and only with services being provided for the long term. As our Superior Court has stated:

> Permanency Planning is a concept whereby children are not relegated to the limbo of spending their childhood in foster homes, but instead, dedicated effort is made by the court and the children's agency to rehabilitate and unite the family in a reasonable time, and failing in this, to free the child for adoption.

Interest of M.B., 449 Pa. Super. at 511, 674 A.2d at 704 (quoting Interest of Sweeney, 393 Pa. Super. 437, 574 A.2d 690 (1990)). Unless these children were to remain in the limbo of foster care indefinitely, when the testimony and the record reveal that reunification with Mother is unlikely to occur in the reasonably foreseeable future, a change of goal was necessary to serve their best interests and permit them to achieve the permanent and stable family life they

deserves. See, *In re: G.T.*, 897 A.2d 1197 (Pa. Super. 2006); *In re: K.D.*, 871 A.2d 823 (Pa. Super. 2005); In Interest of Lilley, 719 A.2d 327 (Pa. Super. 1998).

Finally, the change of a goal from return home to adoption does not terminate Mother's parental rights; it is only the first step in the process. See, *In re: S.B.*, 943 A.2d at 978; *In re: N.C.*, 909 A.2d at 824; *In re: A.L.D.*, 797 A.2d 326, 339 (Pa. Super. 2002). As a practical matter, the goal change simply identifies adoption as the favored disposition and relieves CYS from its obligation to continue to provide a parent further services. *In re: N.W.*, 859 A.2d 501, 509 (Pa. Super. 2004). As noted by the Court at the January 12th hearing Mother may yet be able to overcome his deficiencies and demonstrate to either this Court at the next review hearing or to the Orphans' court[3] at a future termination proceeding that she is now able to parent her children and that her parental rights should not be terminated. However the burden of continuing towards that goal now rests with her and she must obtain the services necessary to reach that goal outside of the agency. Accordingly, based on all the evidence produced during this matter the goal change was proper and there is no merit to this allegation of error.

Accordingly, for the reasons discussed herein, the appeal should be dismissed and the Court's Orders of January 16, 2018, should be affirmed.

RESPECTFULLY SUBMITTED,

Norman A. Krumenacker, III, P.J.

March 21, 2018

---

[3] Terminations of parental rights proceedings occur in a different division and before a different judge of this Court.