J-A22024-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.C.A., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.A., FATHER | : : : : : : | |
| | : | No. 784 MDA 2021 |

Appeal from the Decree Entered May 24, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0035a

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED: FEBRUARY 8, 2022**

Appellant, D.A. (Father), appeals from a decree entered on May 24, 2021 in the Orphans' Court Division of the Court of Common Pleas of York County that terminated Father's parental rights to A.C.A., a minor female whose date of birth is August, 2015.[1]  We affirm.

A stipulation between counsel for the parties summarizes the factual background detailing how this case initially came to the attention of the York County Office of Children, Youth, and Family Services (CYF).

> An application for emergency protective custody was filed by CYF on August 23, 2018.  In the application, it was alleged that on or about August 22, 2018, CYF received a referral regarding A.C.A. and her half sibling due to allegations of substance abuse by B.J.W.  The allegations received were that B.J.W. was in a car accident while A.C.A. was an occupant in the vehicle.  When

---

[1] The final decree from which Father appeals also terminated the parental rights of A.C.A.'s biological mother, B.J.W.  B.J.W. has not appealed from the decree.

emergency medical services arrived at the scene, B.J.W. was minimally responsive and appeared drowsy. The maternal grandmother was also in the car and appeared impaired. An empty bottle of Xanax was located in the car and information was received that B.J.W. filled her prescription for 80 pills on August 21, 2018. A.C.A. was not in proper car restraints. A.C.A. had some facial abrasions, it appeared that her pull-up diaper had not been changed in some time, and there was urine on her clothing. B.J.W. and A.C.A. went to the hospital for further evaluation. B.J.W. was not alert and not able to remain awake. B.J.W. was drug tested and tested positive for benzodiazepines, opiates, and marijuana. Initially, B.J.W. could not provide any family members as possible resources for A.C.A. and her [half] sibling. Father was not an appropriate resource; he acknowledged that he had been found to be abusive by the Maryland Department of Human Services on one occasion for hitting A.C.A.'s sibling and was also criminally charged and convicted for leaving A.C.A. in a car while he went into a store. The family then provided the name of a paternal grandmother of A.C.A.'s sibling as a resource. The paternal grandmother was willing to be a resource and was approved as an emergency caregiver through CYF. On August 22, 2018, the trial court was contacted and verbally awarded temporary legal and physical custody of A.C.A. to CYF for placement with an emergency caregiver, if approved, or foster care.

Stipulation of Counsel, 5/19/21; Application for Emergency Protective Custody, 8/23/18.

The trial court then summarized the relevant procedural history which ensued after A.C.A. entered into foster care.

A.C.A. has been an adjudicated dependent since September 2018. Father is the natural father of A.C.A. who was the subject of the dependency proceedings. Since the permanency review hearing of February 11, 2020, Father was reported to have made moderate progress toward parenting goals. In October 2020, it was revealed that A.C.A.'s older sister made disclosures regarding sexual abuse and misconduct by Father. It was further revealed that Maryland authorities already had an open investigation regarding sexual abuse and misconduct by Father for a separate allegation concerning A.C.A. and her half sibling. A.C.A. was

interviewed about these allegations but those interviews did not produce disclosures.

On January 26, 2021, at a permanency review hearing, it was reported that A.C.A.'s older sister made another disclosure which prompted a third investigation. Given the time period that A.C.A. had been a dependent and the third allegation of sexual abuse, the trial court changed the primary goal to adoption while keeping reunification as a concurrent goal. During each of these investigations, Father's visits were supervised or suspended.

At a February 24, 2021 hearing, the Maryland agency reported that the child was interviewed but made no disclosures. Accordingly, the Agency closed the investigation due to the fact that the child did not disclose anything during the third A.C.A. interview. On March 1, 2021, Father filed a motion to change goal back to reunification. The trial court held a hearing on March 3, 2021 on this matter. However, in furtherance of A.C.A.'s best interest, the trial court denied Father's motion.

On April 1, 2021, Father filed a notice of appeal and concise statement of errors complained of on appeal. On April 20, 2021, the trial court filed its opinion pursuant to Pa.R.A.P. 1925(a). The trial court then held a termination of parental rights hearing on May 21, 2021. An order granting termination of both Mother's and Father's parental rights was entered on May 24, 2021. Following termination of Father's parental rights, Father withdrew his appeal of the trial court's denial of his goal change motion on June 3, 2021. A few weeks later, on June 18, 2021, Father filed a notice of appeal and concise statement challenging the termination of his parental rights.

Trial Court Opinion, 6/24/21, at 1-3.

Father raises the following claims for our review.

1. Did the trial court commit reversible error involuntarily terminating the parental rights of the natural father without clear and convincing evidence supporting that determination?

2. Did the trial court commit reversible error in basing its decision to involuntarily terminate the parental rights [of] the natural father based upon evidence that is not of record in this case?

Father's Brief at 5.

On appeal, Father maintains that the record lacks clear and convincing evidence to support the involuntary termination of his parental rights to A.C.A. In developing this claim, Father asserts that he relocated from Maryland to Pennsylvania and, thus, resolved the issues that initially led to A.C.A.'s placement in foster care. Father also claims the record does not establish that he failed or refused to perform parenting duties for A.C.A.; rather, Father asserts that he convinced the various service agencies, including CYF, that he was ready to have A.C.A. returned to his custody. Father maintains that the reports and allegations suggesting that he subjected A.C.A. to abuse were deemed unfounded and, hence, cannot constitute the clear and convincing evidence needed to terminate his parental rights. Father contends that, contrary to the trial court's determination, the record shows that he maintains a strong parental bond with A.C.A. Finally, Father claims that the trial court erred in terminating his parental rights by relying, in part, on his alleged admissions to a social worker from Baltimore, Maryland.

Appellate review of an order terminating parental rights implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re I.J.*, 972 A.2d 5, 8 (Pa. Super. 2009), *quoting In re S.D.T., Jr.*, 934 A.2d 703 (Pa. Super. 2007), *appeal denied*, 950 A.2d 270 (Pa. 2008).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. ... We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002) (internal citations and quotation marks omitted). Clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa. Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[–192] (Pa. Super. 2004).

The trial court considered involuntary termination of Father's parental rights on the following grounds:

## § 2511. Grounds for involuntary termination

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\* \* \*

23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8); (b).  Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions.  **In re Adoption of R.J.S.**, 901 A.2d 502, 508 n.3 (Pa. Super. 2006).

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish a parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition.  **In re C.S., supra**.  The court should consider the entire background of the case and not simply:

mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his ... parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

**In re B., N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied,* 72 A.2d 1200 (Pa. 2005), *citing* **In re D.J.S.**, 737 A.2d 283 (Pa. Super. 1999).

The fundamental test in termination of parental rights under Section 2511(a)(2) was established in *In re Geiger*, 331 A.2d 172 (Pa. 1975), where the Pennsylvania Supreme Court announced that, under what is now Section 2511(a)(2), "the p[arty seeking] involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity or neglect that cannot or will not be remedied, are "not limited to affirmative misconduct." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (internal citations and quotation marks omitted) (emphasis added). Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity

under subsection (a)(2). ***In re Adoption of M.J.H.***, 501 A.2d 648 (Pa. Super. 1985); ***see also Matter of Adoption of C.A.W.***, 683 A.2d 911, 916 (Pa. Super. 1996). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." ***In re A.L.D.***, ***supra*** at 340. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***Id***.

Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child. ***In re Adoption of Michael J.C.***, 486 A.2d 371, 375 (Pa. 1984). As our Supreme Court explained, if the statute required physical custody as a prerequisite,

> termination of parental rights would only result after a child has suffered physical, emotional or mental damage. We cannot agree. Neither the language of the Act, nor our case law, supports appellee's position that Section 2511(a)(2) requires a showing that a putative parent have an opportunity to inflict substantial physical or mental harm upon a child before the state can intervene. Rather, a more appropriate reading of the statute is that when a parent has demonstrated a continued inability to conduct his ... life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

***Id***.

Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to

exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(5). "[T]o terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1275–76 (Pa. Super. 2003); 23 Pa.C.S.A. § 2511(a)(8). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." ***In re A.R.***, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. ***Id.*** Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. ***In re Adoption of T.B.B.***, 835 A.2d 387, 396 (Pa. Super. 2003); ***In re Adoption of M.E.P.***, ***supra***.

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements

within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated." ***In re B.L.L.***, 787 A.2d 1007, 1013 (Pa. Super. 2001).

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his ... ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

***In re B., N.M.***, *supra* at 855 (internal citations omitted) (emphasis added); ***see also In re G.P.-R.***, 851 A.2d 967, 976 (Pa. Super. 2004) (holding: "It is incumbent upon a parent when separated from his child to maintain communication and association with the child."). Additionally,

[t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re D.J.S.*, *supra* at 286, *quoting* *In re Adoption of Hamilton*, 549 A.2d 1291, 1295 (Pa. Super. 1988).

There also is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act ("ASFA"), the stated policy of which is:

[T]o remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family.... States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the Adoption and Safe Families Act of 1997. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*In re G.P.-R.*, *supra* at 975–796, *quoting* *In re B.L.L.*, *supra* at 1016.

After careful review, we agree with the trial court that clear and convincing evidence supporting termination of Father's parental rights existed under Section 2511(a)(2). Under that provision, "the p[arty seeking] involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, *supra*. The record reveals that A.C.A. was not under Father's care or custody at the time she entered placement. Father was not eligible to serve as a placement resource at that time because he did not reside in Pennsylvania and because of pending reports of abuse and neglect. Father relocated to Pennsylvania and, after services were deployed for his benefit, he made progress toward certain parenting goals. Ultimately, however, Father never produced evidence of lawful employment, never exercised unsupervised visits, and never assumed custody of A.C.A. Also, testimony at the May 21, 2021 termination hearing showed that, while Father presented gifts and cards to A.C.A., he did not attend her school functions, doctors' appointments, or therapy sessions. Moreover, reports of abuse and neglect continued to be made against Father during the pendency of termination proceedings and the trial court, as the finder of fact, acted within its discretion under our standard of review in crediting some or all these reports even if they were deemed unfounded by the investigating

agencies. *See* N.T. Hearing, 5/21/21, at 36-38 (listing multiple allegations made against Father). The CYF caseworker assigned to this matter testified at the May 21, 2021 termination hearing that Father was not in a position to provide the care, protection, and safety appropriate for A.C.A.'s development. *See id*. at 34. Based upon these factors, which were well supported by competent evidence, the trial court neither erred nor abused its discretion in terminating Father's parental rights to A.C.A. under Section 2511(a)(2).

We further conclude that the consideration of A.C.A.'s developmental, physical, and emotional needs and welfare supported termination under Section 2511(b). As stated previously, the CYF caseworker assigned to this matter testified that Father was not well-positioned to offer sustained parental support to A.C.A. Moreover, in addressing the child's bond with Father, the caseworker described A.C.A.'s attachment to Father as "hesitant." *See* N.T. Hearing, 5/21/21, at 31. Although the caseworker agreed that A.C.A.'s bond with Father seemed to improve when the two were in more regular contact, the CYF agent reported that A.C.A. did not ask about Father. Based upon her interactions with A.C.A., together with her review of service provider reports, the caseworker reported that A.C.A. was forming appropriate bonds with the current foster family and that A.C.A. had formed a closer bond with her foster parents than she had with Father. The caseworker also believed that termination of Father's parental rights would be in A.C.A.'s best interest as she was a young child who had been in placement for at least half of her life.

Stressing the need for permanence and stability in the provision of care and parental support, the CYF caseworker concluded that termination of Father's parental rights would not have a long-term, permanent impact upon A.C.A. *See id.* at 36. These factors offer clear and convincing support for the termination of Father's parental rights under Section 2511(b).

Having determined that CYF satisfied the requirements for termination under Sections 2511(a)(2) and (b), we affirm the trial court's decree entered May 24, 2021 terminating Father's parental rights to A.C.A.[2]

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/08/2022

---

[2] In view of the ample evidence introduced to support termination of Father's parental rights to A.C.A., we need not address Father's limited claim asserted in his second issue which challenges the evidentiary basis of a single report of abuse or neglect allegedly committed by Father.